LORENZO H. JUDSON, Administrator, v. GREAT NORTHERN RAILWAY
COMPANY.[1]

December 19, 1895.

Nos. 9598—(142).

**Accident at Railroad Crossing—Contributory Negligence.**

While a failure on the part of those in charge of a locomotive to give the
statutory signals constitutes negligence per se on the part of the railway com-
pany, such failure does not render the company liable for injuries received at
a common country crossing if the traveler injured contributed thereto by
omitting to look and listen.

**Same—Irregular Train.**

Swiftly moving and irregular trains are to be expected at such crossings,
and it is the duty of persons about to go upon them to look and listen for
such trains, as well as for those upon time or which move slowly.

**Contributory Negligence—Wanton Negligence.**

Held, upon an examination of the uncontradicted evidence in this case, that
it conclusively appeared that plaintiff's intestate, who was killed at such a
crossing, was guilty of contributory negligence, and also that there was no
evidence upon which a verdict could be supported founded on the claim that
those in charge of the locomotive wantonly ran down upon such intestate, or
failed to exercise due care and diligence after discovering that he was in a
place of danger.

Appeal by defendant from an order of the district court for Polk
county, Ives, J., denying a motion for a new trial, after a verdict in
favor of plaintiff for $5,000.   Reversed.

*C. Wellington*, for appellant.

*H. Steenerson*, for respondent.

COLLINS, J.   This was an action brought by plaintiff, as adminis-
trator of the estate of a minor son, who was killed in a collision be-
tween plaintiff's horses and wagon and one of defendant's trains at a
public highway crossing, to recover damages.   The complaint, after
setting out the circumstances, alleged that the death of the boy was
the result of the negligent, unlawful, and wanton management of the
train by those in charge after they saw the boy in a perilous posi-

[1] Reported in 65 N. W. 447.

tion.   At the close of plaintiff's testimony, counsel for defendant moved to dismiss upon the ground that the evidence conclusively showed contributory negligence on the part of the boy, and also failed to show that by means of ordinary care or prudence the train men could have averted the accident.    To a denial of this motion defendant excepted, and then declined to introduce any evidence.   The proofs in the case being all before the jury, counsel moved the court to direct a verdict in defendant's favor, on the ground that the evidence clearly showed that the boy was guilty of contributory negligence such as would debar recovery, and that there was no proof from which it could be found that the defendant's servants were wanton or willful at the time of the unfortunate occurrence.   This was refused, and after a charge by the court to the jury, which was erroneous in several respects, a general verdict was returned in plaintiff's favor.   As the order denying defendant's motion for a new trial must be set aside if we are to abide by well-settled principles governing such cases, the facts and circumstances which appeared without contradiction upon the trial should be detailed with considerable minuteness.

The accident occurred on a clear day, in the month of October. The deceased was of ordinary size and intelligence, aged 14 years and 7 months, residing with plaintiff upon a farm about four miles southwest of the elevator hereinafter mentioned.   He was presumably in full possession of all his faculties.   The country was level prairie, with nothing but buildings to obstruct the view.   The roads, judging from the photographs in evidence, were not worked or traveled much, and were in fact little more than wagon tracks across the prairie. Defendant's track, going northerly at and near a station called Kittson, bears slightly to the east.   Parallel to this track, on the east side, and about 80 feet distant, was one of the wagon roads we have referred to.   There was no station house at Kittson, and the only buildings were east of the main track, namely, a railroad section house, a small tool house, and the elevator.   The tool house stood 270 feet north of the section house, and the elevator 900 feet north of the tool house.   The elevator was 32 feet wide, and at the rear— east side—was the usual driveway for wagons.   The front of the elevator stood 50 feet from the main track.   A side track left the main near the tool house, and, passing close by the elevator, con-

nected again something over 500 feet northerly.    A road from plaintiff's farm ran northeasterly across the prairie, crossing the main and side tracks 480 feet north of the elevator, and it was at this crossing that the collision occurred.    Fifty-four feet east of the main track, and a few feet east of the side track, was the railroad ditch, covered, where crossed by the highway, by a small bridge or culvert.    Twenty feet from the culvert, or about 74 feet east of the main track, the wagon tracks bore to the right and to the left into the north and south road we have spoken of.

On the morning in question, William Judson, the intestate, went to the elevator with a load of wheat, driving a spirited pair of horses, which his father had owned about one year.    He had driven the team several times, and was capable of managing them under ordinary circumstances.    He was acquainted with the roads and the surroundings.    An older brother, Robert Judson, was in company with him, driving another team.    Robert and Ernest Hanna, neighbors, went at the same time, each driving a pair of horses attached to wagons loaded with wheat.    All crossed the tracks at the usual crossing, turned south at the forks of the road, and went to the elevator, where the Hannas first unloaded.    Robert Judson then took the team driven by his brother, the deceased, unloaded the wagon, and went to the foot of the driveway for his own team and load. Young Judson drove his own team out of the way, and, after getting off the driveway, turned squarely to the north, and started back towards the crossing.    Robert and Ernest Hanna had driven over the crossing, had then noticed the train coming from the south, and, after driving a few rods westerly, observed young Judson driving northerly towards the forks of the road.    They stopped their horses, and at once became fearful of a collision.    They were the only witnesses who plainly saw the coming train, the boy with his team, and the collision; and their testimony as to what occurred was exceedingly fair and impartial.

Each of these men noticed that the team was upon a sharp trot, the speed increasing as the horses came on towards the railway crossing, so that, in their opinion, the horses, when they turned westerly at the forks of the road, were traveling from six to seven miles an hour.    The boy did not look towards the railway tracks at all from the time these witnesses saw him, soon after he emerged from behind

the elevator, but drove straight on, seemingly engaged in arranging the empty sacks on the bottom of the wagon bed. Both witnesses feared that his attention was so much given to the sacks that he would not observe the train, and every movement of the boy and the horses was anxiously noticed by these two men up to the time the latter turned west, 74 feet from the rails of the main track. The boy could not then be seen by the men because of the position of the horses. The train, consisting of a locomotive, 10 or 12 box cars, and a caboose, was a "wild" freight, running at an unexpected time, and the rate of speed, as estimated by plaintiff's witnesses, was from 15 to 35 miles an hour. It made the usual amount of noise, but there was testimony which would have warranted the jury in finding that no bell was rung or whistle blown for the crossing, except just before the collision, and that in this respect defendant was guilty of negligence. Taking the lowest estimate of the rate at which the horses were trotting, 6 miles per hour, and the highest estimate for the speed of the train, 35 miles per hour, and we find that the latter was going about 6 times as fast as the former, so that when the train was 1,200 feet from the crossing the horses were not far from 130 feet south of the forks of the road, say 200 feet from the crossing. When the team reached the forks, where they turned to go west to the crossing, the train must have been about opposite the north end of the elevator, if going 6 times as fast as the horses. One of the Hannas testified, however, that the train was about half way from the elevator to the crossing when the boy, still busy in arranging the sacks, drove to the west.

Standing at the forks of the road, it was undisputed that a person had an unobstructed view of the railway track to a point 1,300 feet south of the crossing. If the boy had looked before turning, say 80 feet from the place of collision, he certainly would have seen the train, for it was then in plain sight, about opposite the north end of the elevator. The eyewitnesses before mentioned stated that the team came rapidly after making the turn, without being held in, so far as they could see, until the horses reached the culvert, 74 feet from the main track, or, perhaps, until the side track, which was a little nearer, was reached, when they appeared to become frightened, swerved to the right, sprung forward, and cleared the front end of the locomotive. The wagon was broken to pieces, and the boy in-

stantly killed, the head of the train being brought to a standstill about 2,000 feet north of the crossing.

There was no effort to show that the engineer or any other employé upon the train saw the horses or the boy at any time, either when they were in a safe place, going northerly on the road, parallel to and about 80 feet from the rails, or after the turn was made, which almost immediately brought the boy into a perilous place, driving, as he was, a spirited pair of horses. And if we assume that the engineer saw the team and the boy, or should have seen them,—for they were upon his side of the locomotive,—as they were upon the parallel road, it is obvious that he would not expect the boy to disregard the usual instincts of self-preservation, and to immediately place himself in a dangerous position by turning to the left, and approach the crossing. Nor would he be required to make preparations to guard against any such act upon the part of the boy. He would naturally expect that the driver of the team would keep northerly on the road, which continued that way, plain to be seen, or would turn to the east, or perhaps drive out upon the open prairie. So that, had the engineer been on the lookout, as he should have been, for human beings or animals which might suddenly come upon the track, there was not a thing to suggest that plaintiff's intestate contemplated driving upon the crossing until his horses were turned in that direction. Even then the natural supposition would be that the team would be brought to a halt, that the train might pass; not that the driver was unmindful of the danger, and would drive headlong into it. It is plain that, if actual knowledge of the perilous position of the boy is to be attributed to defendant's servants, it can only be from the time that they saw, or, in the exercise of due care, should have seen, that the horses were not being checked, or at least from the time they were turned off from the north and south road towards the crossing.

If, as stated by one witness, the train was running 35 miles an hour, it was about 400 feet away from the crossing when the horses turned to the west, 74 feet from the same point. If, as stated by witnesses who were in a better position to judge of the speed of the train, it was half way from the elevator to the crossing when the team turned, it was less than 250 feet from the crossing before it could have been surmised that the driver did not intend to stop. No

effort was made to show how the train was supplied with appliances for stopping it or reducing its speed, or within what distance it could have been brought to a standstill. There was not a particle of evidence from which it could have been gathered that with the greatest exertion possible the train could have been halted in less than 2,000 feet, the distance it ran before stopping immediately after the accident. The fact was that as to the means for stopping the train, and the ability of those operating it to stop it, or even to reduce the speed in any appreciable degree, there was a total absence of proof, and all was left to be conjectured by the jury. Conjecture and surmise on these important matters, capable as they are of clear proof, cannot be tolerated. If, therefore, the verdict was based, as it might have been under the charge, upon the claim that defendant's employés were willfully negligent when operating the train, willful negligence must have been found by the jury solely from the evidence as to the rate of speed, or the failure to give the customary statutory signals when approaching the crossing, or, possibly, both together. There was no other evidence on which to predicate such a finding, unless it is to be held that an engineer is bound to assume that all persons traveling in perfectly secure places in the vicinity of railway tracks may suddenly and unnecessarily leave such places of safety, and drive into those of great danger, where collisions are imminent or inevitable; and therefore that the engineer must manage and control his locomotive with such assumption in view, and be prepared to avoid the consequences as far as possible.

From our statement of the undisputed facts it was conclusively established that the boy was guilty of contributory negligence approaching recklessness. He was not driving towards an unknown crossing, or one made extra hazardous by the manner in which the railway intersected the public road. Although near an elevator situated on defendant's side track, it is clear that the travel was light, and that the crossing was nothing more than a country crossing. There was no town or village, not even a depot, at Kittson. The deceased had been over the highway at this point five or six times before, and, had this not been the fact, the main and side tracks lay there in plain sight. There was nothing to divert or distract his attention from the approaching train. He drove deliberately towards the crossing, at least, until it was beyond his power to

avoid or to extricate himself from peril, without taking the slightest precaution, without looking to see whether a train was coming; and "such omission has been again and again, both as to travelers on the highway and employés of the road, affirmed to be negligence. The track, as it seems necessary to iterate and reiterate, is itself a warning. It is a place of danger. It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom." This is the universal rule, and, in substance, has often been stated by this court. Vigilance is required on the part of one about to cross a railway track. He must look as well as listen. If he fails to do both, and is injured, it is well settled, as the general rule, that no recovery can be had unless there is evidence tending to show that the injury was willfully or wantonly or intentionally inflicted.

We need not cite authorities in support of these propositions. While the failure to give the proper signals constitutes negligence per se on the part of a railway company, such failure does not render it liable for injuries received at a common country crossing, if the person injured contributed thereto. Williams v. Chicago, M. & St. P. R. Co., 64 Wis. 1, 24 N. W. 422; Stepp v. Chicago, R. I. & P. R. Co., 85 Mo. 229; Wabash, St. L. & P. R. Co. v. Wallace, 110 Ill. 114; Atchison, T. & S. F. R. Co. v. Townsend, 39 Kan. 115, 17 Pac. 804; Cleveland, C., C. & I. R. Co. v. Elliott, 28 Ohio St. 340; Shaw v. Jewett, 86 N. Y. 616; Hinckley v. Cape Cod R. Co., 120 Mass. 257; Matta v. Chicago & W. M. R. Co., 69 Mich. 109, 37 N. W. 54.

There is no merit in the claim of counsel for plaintiff that this case is excepted from the general doctrine because the train was an irregular one, running very fast. Swiftly moving and irregular trains are to be expected, and it is the duty of persons about to go upon crossings to look and listen for such trains as well as those on time, or which run slowly. Nor was it shown that the boy had any knowledge of the time or the rate of speed of regular trains when passing over this crossing. If he had no knowledge upon these matters, he was not led into fancied security and a dangerous position because the train was an irregular one, or because it was running rapidly. So, if the verdict was founded upon a finding by the jury that the deceased was not guilty of contributory negligence,—and the charge would have justified such a finding,—the evidence was not only in-

sufficient to support it, but was conclusively against it.    Of course, contributory negligence on the part of a person injured will not avail as a defense to the wrongdoer in case the injury is wantonly inflicted, for in such a case the negligence of the injured party would not be the proximate cause of the injury.    It was incumbent on defendant's servants, when they discovered the boy in a perilous place, to exercise ordinary care and diligence, depending upon the circumstances, to avoid running him down.    There was no evidence from which it could even be inferred that they did not exercise ordinary care and diligence, and consequently nothing whatever to indicate wantonness.

Order reversed, and a new trial granted.