ELIZABETH K. DART v. PURE OIL COMPANY AND OTHERS.[1]

May 9, 1947.

No. 34,073.

*David A. Bourgin, Gust A. Koski,* and *Charles T. Wangensteen,* for appellant.

*Gillette, Nye, Harries & Montague* and *W. O. Bissonett,* for respondents.

Separate briefs as *amici curiae* were filed by *T. O. Streissguth, Frank E. McAllister, John Edmund Burke,* and *Clifford W. Gardner; J. H. Mulally* and *Philip Stringer; Faegre & Benson, Paul J. Mc-*

---

[1]Reported in 27 N. W. (2d) 555.

*Gough,* and *Wright W. Brooks; William L. Prosser; Dell & Rosengren;* and *William H. DeParcq.*

FRANK T. GALLAGHER, JUSTICE.

This case is here on reargument. Subsequent to the original argument and before any decision was made, there was a change in the personnel of the court. Thereafter and on April 26, 1946, the court ordered the parties involved to submit new briefs and invited a number of attorneys to file briefs as *amici curiae.*

Plaintiff as administratrix of the estate of her husband, Harry W. Dart, brought an action for damages for his death, alleged to have been caused by an explosion of a mixture of gasoline and kerosene sold to decedent in violation of Minn. St. 1945, §§ 296.01, subd. 4, 296.05, subd. 2, and 296.22, subds. 1, 2, and 3.[2]

At the close of plaintiff's testimony, the court dismissed the action against defendant Jean Dispen, doing business as Dispen's Grocery, and at the close of all the testimony it directed a verdict in favor of the remaining defendants. From the order denying her motion for new trial, plaintiff appeals.

Defendant Pure Oil Company, hereinafter referred to as the company, is a corporation engaged in operating and conducting a wholesale and retail business for the distribution and sale of petroleum products and operates a bulk plant at Hibbing. Defendant David Sampson is the manager and in charge of the company's operations at that place. Defendant Jean Dispen operates the Dispen Grocery, hereinafter referred to as the grocery, at Red Ore or Mitchell Location, in the vicinity of Hibbing, and was a regular purchaser of kerosene delivered by the company.

Prior to his death, decedent, a railroad conductor, lived in a cabin at Mitchell Location. At about 8:30 a. m. on October 16, 1943, two employes of the Erickson Lumber Company delivered some lumber and briquets to the premises of decedent. He was alone in the

---

[2]See, M. S. A. §§ 296.01, subd. 4, 296.05, subd. 2, and 296.22, subds. 1, 2, and 3, and cf. Mason St. 1946 Supp. §§ 3787-25, subd. 4, 3787-27, subd. 2, 3787-44, subds. 1, 2, and 3.

cabin at the time. The Erickson employes awakened him to get instructions as to where to unload the material. After giving some instructions, decedent went back into the cabin and a few minutes later came out partially dressed and remarked: "I have a hard time to get my fire started. * * * Maybe the coal will help to get it going. It is some green wood." After putting some of the briquets in a bucket he went back into the cabin. About ten minutes thereafter, an explosion occurred in the cabin, described by one employe as "some kind of a commotion in the building. * * * Sounded like just thunder away off," and by the other employe thus: "I heard a muffled explosion. It seemed more like a jar than an explosion." And in reply to the question, "Did you hear anything else following that?" he said, "Just heard him scream, that is all." When the employes came into the cabin they saw decedent in flames. They got him outside, extinguished the flames by rolling him in the sand, and took him to a hospital, where he died a week later from the burns received in the explosion. On the way to the hospital he stated that "he heard that happening to other people but he never thought he would fall for such a thing * * * or such a game." He also stated to an attending physician that he "poured some kerosene into the fire of a stove and the explosion resulted causing him to be burned severely." After the firemen extinguished the fire, they discovered that the front part of the cabin was badly scorched and that there was a "blistering" of the woodwork. In the middle of the front room of the cabin was a heating stove, the door of which was found open. The kerosene can used by decedent in attempting to kindle the fire was found about halfway through the door of the stove. The bottom of the can was blown out and its seams weakened by the melting of the solder. The stove was not damaged, and there was no fire in it. Undisturbed was a foundation for a fire of green popple with briquets on top. There was evidence that the wood was "blackened," "had a little black smoke on it," "there might have been a little particle of smoke around this—on this green popple and underneath." Another kerosene can was found outside the cabin. This can, which had been thrown there by decedent's wife when she

cleaned up the cabin after the explosion, contained pure kerosene. Tests also showed that there was pure kerosene in the lamps and in a kerosene stove in the cabin.

Kerosene was kept at the grocery in a 50-gallon barrel. Between August 1, 1943, and October 16, 1943, three deliveries of kerosene were made by the company to the grocery, viz., August 12, September 7, and September 25. Two witnesses testified that they observed decedent going to or from the grocery with a kerosene can about a week or ten days before October 16, the date of the explosion. One of the witnesses testified that he was carrying only one can. Although Jean Dispen testified that the credit book showed decedent's last purchase to be on September 14, she conceded that he sometimes paid cash for his merchandise. She further stated that the only place she bought kerosene was from the company and that her place was the only place where decedent had purchased kerosene. It further appears that on the afternoon of the day of the explosion she told Mrs. Mildred Lind that she was feeling blue because "You know, he [Dart] bought the kerosene here."

The company delivered kerosene to the grocery in a truck equipped with a tank consisting of four compartments, the front one of which had a capacity of 400 gallons; the second, 200 gallons; the third, 100 gallons; and the fourth and rear compartment, 100 gallons. It was common practice to alternately carry kerosene and gasoline in the same compartment on the same day or at different times. Reversible tags were placed near each faucet on the rear of the truck. The word "gasoline" appeared on one side of the tag, the word "kerosene" on the other side. When a delivery was made at the grocery, the 50-gallon barrel was filled by the use of two five-gallon cans, one painted red and the other galvanized. Both were used for carrying kerosene and other products.

On October 23, 1943, a week after the explosion and the day of decedent's death, Mrs. Dispen notified defendant Sampson that she had received a number of complaints about the quality of the kerosene. Before Sampson arrived at the premises on the same day, she told the various customers who had purchased kerosene from the

September 25 delivery to return it to her or to pour it out. Some returned the kerosene to her, and she poured it back into the 50-gallon barrel. After the kerosene had been poured back into the barrel, Mrs. Dispen took a sample. This was the sample analyzed by the chemist, who testified that it was an explosive mixture containing some gasoline. The kerosene in the barrel was not the color of ordinary kerosene, but was of an amber hue. Defendant Dispen described it thus: "I termed it skunk oil. * * * That is what it looked like to me, and that is what it smelled like."

Another customer of the grocery, Ellsworth W. Lind, made his last purchase of kerosene from the store on October 15, 1943, out of the batch last delivered on September 25, 1943. Shortly after the explosion in decedent's cabin, Lind's wife had some trouble with this kerosene. Lind stated that the kerosene "didn't smell like it was real kerosene" and that it "was kind of yellowish in color." Mildred Lind, his wife, testified that she attempted to kindle a fire in the wood stove. She placed a match in the stove and "lifted up the can and started to pour, and the fire just jumped from my match into the can. The can itself was afire, and the flame was spouting out of the side. * * * The flame was going like this, and it made a noise like this * * * [illustrating], only much louder."

When Sampson arrived at the grocery, he removed the contents of the barrel and replaced it with new kerosene. He stated to the chief of the Hibbing fire department that "there might have been gasoline" in the kerosene delivered to the grocery. He likewise took a sample of the contents before its removal. He described the color as "a sick amber color, kind of light amber. * * * It was yellowish, halfway between yellow and amber; * * *." When asked on cross-examination, "When you saw this had this yellowish or sickish amberish color you were suspicious that it contained gasoline?" he replied: "I didn't know what it contained, but I knew it should not be there. * * * It could contain gasoline or fuel oil. It didn't act so much like gasoline. It could contain either one."

C. A. Graves, a chemist, analyzed the sample removed by defendant Dispen. He testified that it flashed at a temperature of 68 de-

grees Fahrenheit, whereas ordinary kerosene does not flash until its temperature is between 145 and 160 degrees Fahrenheit. He further stated that the sample was a mixed product with some gasoline in it and that it was an explosive mixture and a dangerous product; that its color was amber, whereas ordinary kerosene is water-white with a bluish cast. As to the cause of the explosion, he testified:

"My idea of that is this: Mr. Dart lighted a match or paper at the bottom of the stove and then began pouring in this material, which ignited and followed up the spout and struck the explosive mixture in the can, and away she went.

* * * * *

"Q. What caused the explosion?

"A. Explosive mixture in the can and the flame."

His testimony regarding the kerosene can found in the door of the stove was as follows:

"Q. Have you examined this can?

"A. I have.

"Q. Is there evidence of explosion within or without this can?

"A. The bottom has been blown off.

"Q. Is that evidence of explosion?

"A. It is.

"Q. Are there other things about the can?

"A. Melted solder, evidence of heat. The melted solder at the seams, evidence that there was heat at the seams there showing the way it is torn off. It was blown off and not torn off, because there are no tool marks or impressions."

Plaintiff assigns as error (1) that the trial court erred in directing a verdict for defendants, and (2) that the trial court erred in denying plaintiff's motion for a new trial.

■ These assignments of error present two issues for determination by this court: (a) Whether in the light of the statute and facts in this case contributory negligence is available as a defense; and (b) whether the evidence raised issues of fact which the trial court should have submitted to the jury. Although plaintiff assigns as

error the failure to submit the issue of negligence to the jury, her cause of action is based upon a violation of certain statutory provisions (Minn. St. 1945, §§ 296.01, subd. 4, 296.05, subd. 2, and 296.22, subds. 1, 2, and 3) with reference to the sale and delivery of volatile oils.

Where under the laws of the state enacted for the protection of the public certain precautions are prescribed to be observed in handling and labeling volatile oils distilled from petroleum, one injured by an explosion of gas from such oils establishes a cause of action by showing a breach of the statutory requirement and that such breach was the proximate cause of the injury and damages sustained thereby. See, Farrell v. G. O. Miller Co. 147 Minn. 52, 179 N. W. 566.

We will first consider the general classification of the statute under consideration. Broadly speaking and subject to exceptions and limitations as applied to it, when a statute is passed the courts generally tend to associate it with the type of common-law liability most closely related to the statute. For example, a statute prohibiting going on property and cutting timber is thought of in the classification of a trespass statute; one prohibiting the receiving of bank deposits after insolvency as a fraud statute; one prohibiting the blocking of public highways as a public nuisance statute; and one laying down rules of safety for the protection of the public or any class or group of individuals as a negligence statute.

"Negligence is a failure to exercise the care required by the law under the circumstances—in short, the want of due care. * * * In ordinary cases, the best definition of negligence for a jury is, 'the failure to exercise such care as persons of ordinary prudence usually exercise under similar circumstances.' " 4 Dunnell, Dig. & Supp. § 6969.

"Negligence is conduct falling below the standard established by law for the protection of others against unreasonable risk of harm." Prosser, Torts, § 30.

Plaintiff contends that the statutory liability as a ground for recovery is separate and distinct from, and hence independent of, common-law negligence, and that if decedent's death was proximately

caused by a statutory violation plaintiff is entitled to recover regardless of any question of contributory negligence.

This court has on many occasions declared that the violation of a statute is no more than ordinary negligence, with certain exceptions, which we will hereinafter refer to. The leading case is Osborne v. McMasters, 40 Minn. 103, 105, 41 N. W. 543, 12 A. S. R. 698, where Mr. Justice Mitchell said with respect to a statute requiring "Poison" to be labeled:

"* * * Negligence is the breach of legal duty. It is immaterial whether the duty is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, or is imposed by a statute designed for the protection of others. * * * The only difference is that in the one case the measure of legal duty is to be determined upon common-law principles, while in the other the statute fixes it, so that the violation of the statute constitutes conclusive evidence of negligence, or, in other words, negligence *per se* * * * All that the statute does is to establish a fixed standard by which the fact of negligence may be determined."

Similar statements are contained in other Minnesota decisions, as in Schutt v. Adair, 99 Minn. 7, 9, 108 N. W. 811, 812, where the court said:

"* * * Though the violation of a statutory duty may constitute negligence per se and actionable if injury result therefrom, nevertheless, statutes imposing such duties are not so construed as to abrogate the ordinary rules of contributory negligence, unless so worded as to leave no doubt that the legislature intended to exclude the defense."

In Schaar v. Conforth, 128 Minn. 460, 462, 151 N. W. 275, 276, this court said:

"* * * the settled law is that if the violation of the statute results in injury to one for whose protection it was enacted there is liability. The doctrine stated is limited by the rule as to contributory negligence and assumption of risks when such rule is applicable."

We believe from an examination of a great many cases that it has been the long-standing rule of this court, with certain exceptions, that the violation of a statutory standard of conduct does not differ from ordinary negligence. It therefore follows that in an action based on such a statute contributory negligence is available as a defense. This rule is supported by a great many cases, some of which may be found in 45 C. J., Negligence, § 532; 4 Dunnell, Dig. & Supp. §§ 5895, 5896, 5897, 6000, and 6976; and 5 *Id*. Dig. & Supp. §§ 8145, 8175, and 8193. Under the heading of "Actions Founded on Breach of Statute or Ordinance" in 45 C. J., Negligence, § 532, it is stated:

"In the absence of a contrary statutory provision, and subject to the general exceptions heretofore noted [see 45 C. J., Negligence, § 530], contributory negligence will defeat recovery, even though the negligent act of defendant consisted in the violation of a statute or ordinance [Schaar v. Conforth, 128 Minn. 460, 151 N. W. 275, cited *supra*], and even though such violation is held to be negligence per se [Schutt v. Adair, 99 Minn. 7, 108 N. W. 811, cited *supra*]."

Again, in 45 C. J., Negligence, § 538, under "Statutory Provisions," it is stated:

"* * * However, in accord with the general rule that statutes in derogation of common law are to be strictly construed, the intention to exclude the defense of contributory negligence must clearly appear [Schutt v. Adair, 99 Minn. 7, 108 N. W. 811, cited *supra*]."

The rule is also supported by a long line of decisions of this court. We list some of them in their various classifications as follows:

(A) *Violation of ordinances limiting speed of trains.*
Weyl v. C. M. & St. P. Ry. Co. 40 Minn. 350; 42 N. W. 24; Greenwood v. C. R. I. & P. Ry. Co. 95 Minn. 284, 104 N. W. 3.

(B) *Violation of statutes requiring railway crossing signals.*
Judson v. G. N. Ry. Co. 63 Minn. 248, 65 N. W. 447; Olson v. N. P. Ry. Co. 84 Minn. 258, 87 N. W. 843; Carnegie v. G. N. Ry. Co. 128 Minn. 14, 150 N. W. 164; Capretz v. C. G. W. R. Co. 157 Minn. 29, 195 N. W. 531; Munson v. C. G. W. R. Co. 170 Minn. 513, 212 N. W.

946; Franklin v. M. St. P. & S. S. M. Ry. Co. 179 Minn. 480, 229 N. W. 797.

(C)  *Violation of statute requiring railways to maintain crossing gates or flagmen.*

Schneider v. N. P. Ry. Co. 81 Minn. 383, 84 N. W. 124.

(D)  *Violation of statute as to keeping railway crossing free from obstructions such as ice, snow, and cinders.*

Akerson v. G. N. Ry. Co. 158 Minn. 369, 197 N. W. 842.

(E)  *Violation of statute requiring elevator shaft to be guarded.*

Schutt v. Adair, 99 Minn. 7, 108 N. W. 811.

(F)  *Violation of statute requiring notice by county auditor before selling land for taxes.*

Foster v. Malberg, 119 Minn. 168, 137 N. W. 816, 41 L.R.A.(N.S.) 967, Ann. Cas. 1914A, 1116.

The contesting parties differ greatly as to the interpretation or classification of the statute claimed to have been violated in the case before us.  This brings up the question whether this statute was intended for the protection of the public as a whole or for the protection of a limited class of persons from their inability to protect themselves.  There are exceptional statutes which do not permit the defense of contributory negligence.  In Restatement, Torts, § 483, the principle is stated as follows:

"If the defendant's negligence consists in the violation of a statute enacted to protect a class of persons from their inability to exercise self-protective care, a member of such class is not barred by his contributory negligence from recovery for bodily harm caused by the violation of such statute."

The principle controlling the cases where the defense is not available is thus stated in Prosser, Torts, § 51, p. 392:

"* * * There are certain statutes, however, which clearly are intended to protect the plaintiff against his inability to protect himself.  Such are the child labor acts [Dusha v. Virginia & Rainy Lake Co. 145 Minn. 171, 176 N. W. 482, 23 A. L. R. 632, cited], and various safety statutes for the benefit of employees [Suess v. Arrowhead

Steel Products Co. 180 Minn. 21, 230 N. W. 125, cited], as to which the courts have recognized, in this respect at least, the economic inequality in bargaining power which has induced the passage of the legislation. Since the fundamental purpose of such statutes would be defeated if the plaintiff were permitted to assume the risk, it is generally held that he cannot do so, either expressly or by implication."

The principle of these so-called exceptional statutes is to impose strict or absolute liability upon the defendant, which is greater than ordinary negligence liability, by placing upon him the entire responsibility for any injury which may result from their violation. The following types of statutes have been held to come under such classification:

(A) *Child labor statutes.*

In Dusha v. Virginia & Rainy Lake Co. 145 Minn. 171, 172, 176 N. W. 482, 23 A. L. R. 632, where the defense of contributory negligence and assumption of risk was not available, the court said:

"The purpose of the statute is to protect children in life and limb, by prohibiting their employment in dangerous occupations where, because of their immaturity, they are likely inappreciative of risks and prone to be careless and heedless. So the statute altogether prohibits their employment and makes it a misdemeanor. A very great weight of authority establishes the doctrine that an employer who violates such a statute cannot assert contributory negligence nor the assumption of risks as a defense."

(B) *Statutes prohibiting sale of dangerous articles to minors.*

In Pizzo v. Wiemann, 149 Wis. 235, 134 N. W. 899, 38 L.R.A. (N.S.) 678, Ann. Cas. 1913C, 803, it was held that where the sale of toy pistols was prohibited and made an offense by statute the nature of the wrongful act was such that contributory negligence on the part of the last purchaser, a boy about 11 years of age, was immaterial to either criminal or civil liability of the sellers.

(C) *Statutes for the protection of intoxicated persons.*

In Hauth v. Sambo, 100 Neb. 160, 158 N. W. 1036, it was held that

contributory negligence was no defense to the violation of a statute imposing liability for the sale of liquor. See, also Davies v. McKnight, 146 Pa. 610, 23 A. 320.

In the case of Mayes v. Byers, 214 Minn. 54, 7 N. W. (2d) 403, 144 A. L. R. 821, plaintiff's action was tried, pursuant to stipulation, on the basis of a contract and not as one based on negligence. It was for the recovery of damages for injuries sustained by plaintiff in a fall down a basement stairway in an on-sale liquor establishment operated by defendant. The verdict for plaintiff determined that the maintenance of the stairway in a defective condition in violation of a Minneapolis liquor ordinance caused it to be unsafe. The surety on the liquor dealer's bond was joined as a codefendant. The court construed the ordinance as intended to impose strict liability upon the owners for the protection of intoxicated persons and held that contributory negligence was no defense. The court there said (214 Minn. 61, 7 N. W. [2d] 406, 144 A. L. R. 821):

"* * * The legislation and ordinance here considered manifest a recognition that strict regulation and control are needed for the safety and welfare of patrons who frequent the premises of 'on sale' liquor dealers and that, with their minds and judgment often affected by the excessive use of intoxicants, they cannot be left to their own self-protection. * * * Responsibility for the safety of such persons is placed squarely upon the proprietor of the business—the man to whom the profits of the business go. To insure that responsibility, a bond is required to be made expressly for the benefit of those injured. If these very same people should now be denied the right of recovery in cases where contributory negligence or intoxication could be shown, the very object of this legislation would be substantially defeated."

In determining whether the statute in the case before us comes within the scope of those enacted to protect a class of persons from their inability to exercise self-protective care, we must keep in mind three important facts. In the first place, there is no evidence of an intentional or wilful mixing of gasoline with kerosene as distin-

guished from mere negligence on the part of the company in using reasonable care to avoid the possibility of such a mixture. It does not appear from the record that the company intentionally and wilfully sold to the grocery a mixture of gasoline and kerosene contrary to the statute. Second, it appears that decedent was a mature and experienced man, possessed of all his faculties immediately prior to his attempt to use what he thought was pure kerosene as an aid in starting the fire, and was not suffering from any inability to use reasonable care for his own protection. Third, the statute involved does not, as a penalty for its violation, provide for a recovery of damages for injuries or death caused by its violation.

It is argued on behalf of plaintiff that the case of Dohm v. R. N. Cardozo & Bro. 165 Minn. 193, 196, 206 N. W. 377, 378, best explains the basis of statutory liability and its fundamental purpose to protect one for whom the law was enacted. The court there said:

"We must not lose sight of the fact that in certain cases the violation of an imposed statutory duty results in liability irrespective of such conduct as would constitute negligence in the absence of a statute."

This was a case involving an automobile collision claimed to have been caused by defendant's negligence. It was urged on behalf of defendant that plaintiff was guilty of contributory negligence because of the fact that at the approximate time of the collision his car skidded across the center line of the avenue into the opposite line of traffic. The trial court charged the jury to the effect that because plaintiff was to the left of the center of the street at the time of the collision he was negligent unless some reasonable necessity required him to be there. It was held that defendant's negligence and plaintiff's contributory negligence were questions for the jury. It appears to us that the court there did not change the ordinary rules of negligence, but merely explained that in such a case, where the plaintiff was charged with contributory negligence as a result of violating a traffic law by being on the wrong side of the center line of the street, he could justify or excuse his position provided he was otherwise exercising reasonable and ordinary care in

driving. The holding of the court in that case indicates that a departure from the standard so established by the legislature is no more than ordinary negligence.

It is claimed for plaintiff that in order to rule out the defense of contributory negligence in the instant case it would not be necessary for the court to go as far as it did in the case of Flaherty v. G. N. Ry. Co. 218 Minn. 488, 494, 16 N. W. (2d) 553, 556, where we held that "Where injury is sustained as the result of intentional obstruction of a highway in violation of the statute, the contributory negligence of the person injured is no defense," citing Hanson v. Hall, 202 Minn. 381, 279 N. W. 227. The principal distinction between the case before us and the Hanson and Flaherty cases is that in both of the latter cases the statute involved provided that a violation of it constituted a public nuisance. Minn. St. 1945, § 616.01.[3] In those cases the court determined that the negligent acts constituted a nuisance and were wilful and intentional. In the Hanson case the court said (202 Minn. 385, 279 N. W. 229) :

"The intentional invasion of the rights of another has been termed wilful negligence. However wilful such act may be, it is in no sense negligent. The very fact that an act is characterized as negligent indicates that harm to another as the result of it was neither foreseen nor intended, although a reasonable man would have foreseen danger to others because of it and would have adopted another course of conduct. Wilful negligence embraces conduct where the infringement of another's right is not only intended but also it is foreseen that the conduct pursued will result in such invasion. Mueller v. Dewey, 159 Minn. 173, 198 N. W. 428; Anderson v. Commr. of Internal Revenue [10 Cir.] 81 F. (2d) 457, 104 A. L. R. 676; Restatement, Torts, § 282, comments c, d, § 500, comments f, g.

"Admittedly, defendants intended to invade plaintiff's right to the reasonable use of the highway for purposes of travel. Where an action is based on an unintentional invasion of another's right, the contributory negligence of plaintiff is a proper offset to defendant's liability. McFarlane v. City of Niagara Falls, 247 N. Y. 340, 160

---

[3]See, M. S. A. § 616.01, and cf. Mason St. 1927, § 10241.

N. E. 391, 57 A. L. R. 1. But where the action is based on an invasion which is both intentional and criminal, the mere negligence of the person whose rights are invaded is no adequate defense. Lambrecht v. Schreyer, 129 Minn. 271, 152 N. W. 645, L. R. A. 1915E, 812; Mueller v. Dewey, 159 Minn. 173, 198 N. W. 428; Hinkle v. M. A..& C. R. Ry. Co. 162 Minn. 112, 202 N. W. 340, 41 A. L. R. 1377; Restatement, Torts, § 481; Harper, Torts, § 151."

The decisions in these cases were confined to the situations involved in each particular case. The court did not hold in either case that contributory negligence is not a defense to even wilful negligence in all cases, but merely determined that contributory negligence was not available as a defense where the wilful negligence constituted a nuisance.

We appreciate the comprehensive briefs on reargument and those *amici curiae* filed at the request of the court. After a careful review and consideration of the questions before us, it is our conclusion that the statute alleged to have been violated in this case was not one of the so-called exceptional statutes referred to above, which would bring it within the scope of those statutes precluding the defense of contributory negligence. Accordingly, we hold that the contributory negligence of decedent is available as a defense.

It appears to us that the statute was enacted for the protection of the general public. While it is true that the individual buyer of kerosene or gasoline is entitled to expect that the product he purchases should be within the requirements provided for by statute, it is also true that the handling and use of volatile oils is of such an important and widespread nature and the potential dangers to the public at large resulting from its negligent handling is so general that we believe the statute was enacted for the general public, as well as for the users of such products. We make this statement cognizant of the fact that each purchaser of kerosene or gasoline cannot be expected first to consult a chemist before using such products. However, it appears to us that it would be limiting the scope of the statute entirely too much to say that it was enacted for the protection of a limited class of users so as to bring it under the classifica-

tion where the defense of contributory negligence would not be available. With the widespread present-day use and handling of gasoline and kerosene products, we believe that the general public is deeply concerned with the manner and care with which such products are handled. We can visualize many instances where a violation of the statute might affect the rights of the general public even though the injured person was not at the time a user of the product. For example, if a pedestrian was passing an oil station, even though he was not at the time a purchaser or user of volatile oils, and an explosion occurred at the oil station as the result of a violation of the statute in connection with the negligent handling of kerosene or gasoline, can it be said that the statute was not for his protection as a member of the general public as well as for one who was actually buying or using the product at the time of the explosion? We think not.

We believe, in view of our ruling with reference to the law of negligence and contributory negligence applicable in this case, that the record raises sufficient issues of fact to warrant a new trial. We base our conclusion on the questions raised in the record as to the liability of defendants and the contributory negligence of decedent. Additional evidence may be available. Therefore, we conclude that in the interest of justice a new trial should be granted, and it is so ordered.

Reversed and new trial granted.