(No. 45293.

VELLA J. REESE, Admr., Appellee, v. CHICAGO, BUR-
LINGTON & QUINCY RAILROAD COMPANY *et
al.*—(Koehring Company, Schield Bantam Division,
Appellant.)

*Opinion filed June 25, 1973.—Rehearing denied Sept. 27, 1973.*

SCHAEFER, WARD and RYAN, JJ., dissenting.

KEEGAN & GOSDICK, of Rockford (GEORGE E. SWEENEY and EDWARD V. SCOBY, of counsel), for appellant Koehring Company.

RICHARD T. CUBBAGE and THEODORE G. SCHUSTER, of Chicago, and THOMAS, KOSTANTOCOS and TRAUM, of Rockford (KENNETH W. TRAUM, of Rockford, of counsel), for appellant Chicago, Burlington & Quincy Railroad Company.

ROSZKOWSKI, PADDOCK and JOHNSON, of Rockford, for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

On February 22, 1968, plaintiff's decedent, Lowell Reese, was supervising a crew of Chicago, Burlington & Quincy Railroad employees as they worked along tracks near Walnut, Illinois. The men were loading equipment onto a flatcar using a Schield Bantam crane manufactured by appellant Koehring Company. There were two powered cables, operating on separate drums on the crane; the right cable was being employed to lift materials and equipment, while the left cable held a "clam shell" bucket suspended at the top of the boom. The 1,200-pound bucket was not in use during the loading operation, and to secure the cable holding it, the crane operator had engaged both a foot brake in the cab and a hand-actuated "dog" or pawl, which

was designed to lock the cable drum. Either device was intended to be independently sufficient to hold the cable fast. Reese was standing beneath the boom as the crew prepared to lift a rubble car with the right line. He gave a hand signal to the crane operator, indicating the need for more slack. At that moment, the left-cable foot-brake pedal "jumped off of the floor" in the cab and the bucket fell, striking and killing Reese.

Vella Reese, his widow, brought suit against the Chicago, Burlington & Quincy Railroad under the Federal Employers' Liability Act, 45 U.S.C. secs. 51-60 (1939), and against the Koehring Company on a theory of strict liability for a defective product. The railroad "counterclaimed" against Koehring for indemnity. Immediately before trial, plaintiff and the railroad executed the following agreement:

> "Vella J. Reese, as administratrix of the estate of Lowell Isaac Reese, Deceased, and Vella J. Reese, individually hereby acknowledges receipt from the Chicago, Burlington & Quincy Railroad Company for the sum of Fifty-seven Thousand Five Hundred and No/100 Dollars ($57,500.00) as a loan without interest which said sum I promise to pay from any judgment I am legally entitled to collect from Koehring Company, Schield Bantam Division, a corporation, provided that I shall have no obligation to pay said sum from that amount of any judgment I obtain against Koehring Company, Schield Bantam Division, a Corporation, which exceeds Fifty-seven Thousand Five Hundred and No/100 Dollars ($57,500.00). I further agree that I shall use and pursue any reasonable and legal means which are available to me to collect any judgment I obtain against Koehring Company, Schield Bantam Division, a Corporation."

On plaintiff's motion, the railroad was dismissed without prejudice, and at the commencement of trial, only Koehring remained a defendant in the original cause. Testimony on behalf of the plaintiff tended to show that the failure of the foot brake was due to defects in design and manufacture, and that inadequate provision for

lubrication of the "dog" pivot had been made by defendant Koehring. The defense introduced testimony to the effect that the failure of the "dog" to seat properly was the result of the railroad's inadequate maintenance of the crane. The Winnebago County jury returned a $149,000 verdict for plaintiff and against Koehring. At the conclusion of a bench trial on the railroad's counterclaim, the trial court found for the counter-defendant, Koehring, and ruled that the "loan agreement," in fact, constituted a covenant not to sue. Holding that plaintiff was therefore not obligated to repay the sum advanced, the trial court set off the amount of the loan ($57,500) against the verdict awarded Reese. Both the railroad and Koehring appealed, and the Appellate Court for the Second District affirmed the judgment against Koehring and in favor of Reese. (5 Ill. App. 3d 450.) In reversing the trial court's order as to the set-off and reduction in judgment, the appellate court held the loan agreement enforceable according to its terms and concluded that it should be repaid by the plaintiff to avoid double recovery.

Koehring first asserts that the trial court erred in unduly restricting the defense of assumption of the risk, as interpreted by this court in *Williams v. Brown Mfg. Co. (1970), 45 Ill.2d 418,* and erroneously struck the following portion of Koehring's amended answer.

"AFFIRMATIVE DEFENSE

Further answering Counts III and IV of plaintiff's complaint, defendant alleges that plaintiff's intestate, Lowell Isaac Reese, contrary to the rules of the Chicago, Burlington & Quincy Railroad, and contrary to the safe operation of a crane, ordered and permitted the clamshell bucket to remain on the crane during hoisting operations; and further he stood with the clamshell bucket suspended over his head and thus was guilty of an assumption of risk."

Later, during the opening statements, counsel for Koehring told the jury that the evidence would show that standing under a suspended bucket and permitting a bucket to

remain on a crane during hoisting operations were contrary to the rules of the railroad and to accepted practices regarding the use of cranes. The court granted plaintiff's motion to exclude all such evidence from trial:

"The Court: The ruling is you can't show the railroad rules or the crane manufacturer's rules.

Mr. Keegan: All right, we will leave out the rules. Am I permitted to ask my engineer whether it is the accepted practice to hoist a load with one line while keeping the bucket on top?

The Court: No, that is going into the rules."

During the defense case in chief, counsel for Koehring made the following "offer":

"Mr. Keegan: All I could do is to state that I would have a witness who would state that that was contrary to the rules of the railroad.

The Court: Do you want to put the Rules you have into the record?

Mr. Keegan: Yes. The Safety Rules for the American Association of Railroads, 24.15 and 24.14. And in the Standard Rules of the American Society of Mechanical Engineers, Rules 30.13A, 30.14A, B & C."

We said in *Williams* that the only conduct on the part of a plaintiff in a strict liability action which will bar recovery would be classified as either assumption of the risk or a misuse of the product. (45 Ill.2d 418, 427.) Koehring sought to show that embraced within these concepts are two acts of decedent which appellant argues bar recovery. The acts asserted are Reese's conduct in standing beneath the suspended bucket and directing the commencement of hoisting operations while the clam shell bucket was still suspended from the boom. Since Koehring is unable to demonstrate that Reese was aware of any dangerous or defective condition of the crane, it is clear that these actions do not constitute an assumption of the risk. (45 Ill.2d 418, 426.) Without more, they raise only the possibility of simple contributory negligence, not a defense in a products liability action.

The suggestion that Koehring may be able to negate

plaintiff's proof of proximate causation by showing a misuse of the product requires more extended discussion. Although counsel's description of the proffered testimony may have been intended to indicate a practice unintended and unforeseen by the manufacturer, the offer of proof is inadequate for that purpose. Neither the content of the rules nor the manner of their proof was made clear. We will not speculate whether leaving a bucket suspended from a boom when using the crane to hoist other objects is regarded as a misuse within the contemplation of the Restatement (Second) of Torts and other authorities cited in *Williams* (45 Ill.2d 418, 426), although proof of the existence of a rule of the professional engineering society indicating the crane was not intended for use in this fashion would be admissible as relevant to the issue of misuse. Under these circumstances we cannot hold their exclusion was error. (*People v. Clark (1956), 9 Ill.2d 400, 407.*) The judgment in favor of plaintiff and against the Koehring Company is affirmed.

We now turn to the effect of the "loan agreement" between plaintiff and the railroad. The trial court ruled that the "loan" made by the railroad was actually a covenant not to sue and need not be repaid. Accordingly, the judgment in favor of the plaintiff was reduced by the amount of the payment so as to prevent a double recovery. The appellate court reversed, holding the agreement valid, that no set-off should be made and that the loaned amount was properly repayable to the railroad. The validity of so-called "loan receipt agreements" is a question of first impression in Illinois.

The practice of loaning funds to injured parties prior to an adjudication as to liability originated with marine insurers and became common during the last century. (See generally, Annot. (1967), 13 A.L.R. 3d 42.) Loan receipts developed as a tactic in the struggle between common carriers and insurers to shift liability for shipping losses to one another. When the carriers inserted a clause in their

bills of lading providing that they would receive the benefit of any insurance procured by the shipper, insurers responded by stipulating that they would not be liable when the carrier was at fault. The insuring policies further prohibited the insured from making any agreement which might affect the insurer's right of action against the carrier. These conflicting provisions lead to an unsatisfactory situation wherein a shipper, who was entitled to compensation for loss from either his insurer or the carrier, was without funds until final judicial disposition of his claim against the carrier. Against this background evolved the loan receipt as a device by which insurers could readily put money in the hands of shippers, without compromising their own rights against negligent carriers. It also had the secondary benefit for insurers of preventing subrogation, since suits against the tortfeasors in the insurer's name would seldom be as rewarding as a suit by the injured shipper. This type of arrangement was endorsed by the United States Supreme Court in *Luckenbach v. W. J. McCahan Sugar Refining Co. (1918), 248 U.S. 139, 149, 63 L. Ed. 170, 176, 39 S. Ct. 53, 55,* as "consonant both with the needs of commerce and the demands of justice."

Despite the fairly well-developed case law concerning insurer's loan receipts, we have found few cases dealing with this device when used by potential joint tortfeasors, and most of those cases cited to us by the parties are of little aid. We note, however, that in *Northern Indiana Public Service Co. v. Otis (1969), 145 Ind. App. 159, 250 N.E.2d 378,* where the facts most nearly parallel those here, the loan agreement was held valid. In view of the fact that the railroad was initially sued under the Federal Employers' Liability Act, we assume *arguendo* that it could have been found to be a joint tortfeasor together with the manufacturer of the defective crane. The railroad's assertion that its potential liability was solely derivative through that of Koehring disregards the fact that the railroad was not sued as a supplier of a defective product, but rather for failing to provide a safe place for

the decedent to work. The railroad's claim for indemnity under theories other than as a "passive" tortfeasor were decided adversely to it by the trial court. Thus, in considering the efficacy of loan receipts in Illinois, we contemplate those situations in which a concurrent tortfeasor, perhaps otherwise unable to obtain indemnity from his joint tortfeasor, may escape liability and judgment by loaning funds to a plaintiff. Thus framed, the question becomes whether our policy of denying contribution between joint tortfeasors outweighs the considerations favoring private settlement of lawsuits. We think it does not.

Contribution between joint tortfeasors does not exist in Illinois, except in those cases where a tortfeasor whose negligence was "passive" may be entitled to indemnification from a tortfeasor whose negligence was "active." (*Chicago and Illinois Midland Ry. Co. v. Evans Construction Co. (1965), 32 Ill.2d 600.*) Where the facts do not fall within that exceptional class of cases appropriate for indemnification, it may be fairly argued that a loan agreement permits a joint tortfeasor to achieve by indirection that which he could not do directly. In short, he may thus avoid an adjudication of liability and his joint tortfeasor may ultimately stand the entire loss. Of course it can be argued that one wrongdoer has no right to have all possible defendants joined and that a plaintiff may sue only those whom he pleases. That is no answer here, however, since the railroad was originally joined with Koehring, and it was only after execution of the instrument in question that the railroad was dismissed. If the "loan" is treated as a covenant not to sue, the advantage to the remaining tortfeasor is clear for he will have a partial reduction of the judgment rendered against him. (*New York, Chicago and St. Louis R.R. Co. v. American Transit Lines, Inc. (1951), 408 Ill. 336.*) However, we note that the doctrine refusing contribution among tortfeasors is rooted in equity (see *Wanack v. Michels (1905), 215 Ill. 87*), and that the principal objection to contribution—use

of the courts for relief of wrongdoers—is absent from this private, out-of-court arrangement.

Moreover, there are salutary effects of the loan agreement which warrant our approval. Because of the potential savings to some tortfeasors, funds under this arrangement will be more readily offered to injured plaintiffs than is the case under a covenant to forbear from suit or an outright settlement. Secondarily, loan receipts may tend to simplify complex multi-party litigation, and are desirable from the standpoint of facilitating private resolution of litigation.

Defendant Koehring argues that the use of loan agreements tends to undermine the adversary nature and integrity of the proceedings against the remaining defendant. To a limited extent, we agree. It seems not unlikely that, where a defendant has executed a loan-receipt agreement with a plaintiff who thereupon dismisses that defendant and proceeds against the remaining ones, the employees and witnesses of the dismissed defendant may be substantially more cooperative with plaintiff than would otherwise be true, since any recovery by that defendant of the loaned amount is frequently contingent upon plaintiff's success against the remaining defendants. To some degree the same may be said of many third-party actions. But we believe adequate protection for those defendants exists if by cross-examination they are permitted to establish that a witness knows of the existence of a loan agreement, and, if so, that the witness may be biased or prejudiced as a result thereof. In the event that the existence of such agreement is established, an appropriate instruction limiting the effect of the admission into evidence of the loan-receipt terms might be given at the request of any party.

While it is clear that the execution of the loan agreement and its terms were known to the trial judge, and that a copy of that agreement was marked as an exhibit during the trial, it is not clear that this exhibit was admitted into evidence and considered by the jury. There

is nothing in this record indicating that defendant sought such action. Having failed to do so, Koehring cannot now complain of any unfairness in application of our ruling to this case. Actually, Koehring conceded that the jury was informed as to the adverse relationship between it and the railroad. Consequently, it has already received whatever benefit may be thought to inhere in this holding, since evidence of the loan agreement in any case may be considered solely on the issue of motive and credibility of witnesses and not on the liability or damage issues.

We therefore affirm the appellate court's remandment with directions as to the trial court's final order in this cause. For reasons adequately stated in the appellate court, the judgment in favor of Koehring and against the counterclaimant railroad is also affirmed.

*Judgment affirmed.*

MR. JUSTICE SCHAEFER, with whom MR. JUSTICE WARD and MR. JUSTICE RYAN join, dissenting:

Mr. Justice Ward, Mr. Justice Ryan and I do not agree with the opinion of the majority, which sanctions for the first time in Illinois the use of a "loan receipt agreement." This result seriously undermines, without even mentioning it, the long-standing doctrine that prohibits the assignment of a cause of action for personal injuries or for wrongful death. By the arrangement sanctioned in this case, one of two joint tortfeasors is permitted to buy from the injured person or his administrator the cause of action as it relates to him, and then to participate in the assertion of the cause of action against his co-defendants.

The proposition stated in the leading case of *North Chicago Street R.R. Co. v. Ackley (1897), 171 Ill. 100,* has been adhered to until now: "On grounds of public policy the sale or assignment of actions for injuries to the person are void. The law will not consider the injuries of a citizen, whereby he is injured in his person, to be, as a cause of action, a commodity of sale." 171 Ill. at 108. (See also *Putnam v. Continental Air Transport Co. (7th Cir. 1961),*

*297 F.2d 501.*) In our opinion we should not now depart from it.

The majority are impressed by the fact that loan agreements, similar in form to the present one, have been used in cases involving common carriers, and shippers and their insurers. The opinion states: "This type of arrangement was endorsed by the United States Supreme Court in *Luckenbach v. W. J. McCahan Sugar Refining Co. (1918), 248 U.S. 139, 149, 63 L. Ed. 170, 176, 39 S. Ct. 53, 55,* as 'consonant both with the needs of commerce and the demands of justice.' " The situations involved in *Luckenbach* and the carrier-shipper-insurance-company cases upon which the majority rely differ sharply from that involved in this case. There the liabilities asserted were contractual, both on the part of the carrier and the insurer. The shippers' property had been damaged, and the device of the loan agreement was employed to satisfy, at least partially, the contractual obligation of the insurance company. The situation in the present tort case is not at all analogous to the subrogation involved when payment is made by an insurer to its insured.

Apart from what we think is a misplaced reliance upon the shipper-insurer-carrier cases, the majority opinion advances two grounds of public policy to justify its approval of the loan agreement. It says: "Because of the potential savings to some tortfeasors, funds under this arrangement will be more readily offered to injured plaintiffs than is the case under a covenant to forbear from suit or an outright settlement. Secondarily, loan receipts may tend to simplify complex multi-party litigation, and are desirable from the standpoint of facilitating private resolution of litigation." The statement that "funds will be more readily offered" apparently means that a defendant will offer more for a loan agreement that he will for a covenant not to sue. Under the loan agreement the lending defendant has a chance of avoiding any financial loss, a chance that he does not have under a covenant not to sue or a release.

A plaintiff is allowed to select the defendants whom he will sue, because he is presumed to know how best to assert his rights. (See *Chmielewski v. Marich (1954), 2 Ill.2d 568, 571.*) Many factors may legitimately influence his free choice. But the law should not permit that choice to be influenced by a payment received from one defendant which is designed to operate as an inducement to the plaintiff to join in a pursuit of the other defendants, to the advantage of both of the pursuing parties.

The majority opinion also states that loan-receipt agreements "are desirable from the standpoint of facilitating private resolution of litigation." We do not agree with this assertion. The agreement in this case contains the plaintiff's promises to repay the loan "from any judgment I am legally entitled to collect from Koehring Company," and to "use and pursue any reasonable and legal means which are available to me to collect any judgment I obtain against Koehring Company ***." There is obviously a high potential for litigation as to the exact meaning of these undertakings. And to the extent, as yet uncertain, that these promises require full pursuit by the plaintiff of all of his rights against the nonsigning defendant, litigation is increased rather than diminished. As the Supreme Court characterized the effect of the agreement in *Luckenbach,* "In consideration of securing them the right to conduct the litigation, the insurers made the advances." (248 U.S. at 149.) This, of course, involves, in a tort case, "use of the courts for relief of wrongdoers."

The loan agreement has another unwholesome effect. If the joint tortfeasors differ in the degree of blame they bear for the plaintiff's injury, the loan agreement tends to throw the entire loss on the less blameworthy party. This is because the more blameworthy party will be willing to offer more in the pretrial auction for the opportunity to enter into a loan agreement, and thus hopefully to escape liability altogether. We fail to see how it can be said that such an arrangement advances the public interest.