PACIFIC INDEMNITY COMPANY, et al., Respondents,

v.

THOMPSON–YAEGER, INC., Respondent-Appellant,

Frerichs Our Own Hardware, Inc., Respondent-Appellant,

Tjernlund Manufacturing Company, Respondent,

Yale Engineering, Inc., Appellant-Respondent, (and thirteen other cases).

and

Helder B. MUNSON and Lois M. Munson, d. b. a. The Toy Box, Respondents,

v.

THOMPSON–YAEGER, INC., Respondent-Appellant,

Frerichs Our Own Hardware, Inc., Respondent-Appellant,

Yale Engineering, Inc., Appellant-Respondent,

and

YALE, INC., defendant and third-party plaintiff, Appellant-Respondent,

v.

CORRIGAN PROPERTIES, INC., third-party defendant, Respondent,

Draper & Kramer, Inc., Respondent,

Tjernlund Manufacturing Company, third-party defendant, Respondent.

Nos. 45761, 45811, 45822, 45929, 46018, 46345, 46427, 46470 and 46494.

Supreme Court of Minnesota.

Sept. 16, 1977.

See also, Minn., 258 N.W.2d 762.

Murnane, Murnane, Conlin & White, Thomas M. Conlin, Michael I. Fahey, St. Paul, for appellant, Yale Engineering Co.

Dunlap, Keith, Collins, Towey & Finseth, Rochester, R. W. Towey, for Insurance Co. of North America, Dr. Dale E. Chambers, D. C. and Dr. Wayne Boisen d/b/a Chiropractic Health Center, Centennial Insurance Company, St. Paul Insurance Company and Weichselbaum & Associates, Inc., and Joseph J. Weichselbaum, individually, Implement Dealers Mutual Insurance Company, and The Travelers Insurance Company.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, William D. Flaskamp and James F. Roegge, Minneapolis, for Firemen's Fund American Insurance Companies and Westchester Fire Insurance Company.

West, Gowan & DeBoer, Rochester, John S. Gowan and James F. Roegge, Minneapolis, for Helder B. Munson and Lois M. Munson d/b/a/ The Toy Box.

Robert F. DeVinny, Rochester, for Weichselbaum & Associates, Inc., and Joseph J. Weichselbaum, individually.

Clarance E. Hagglund and Robert Pearson, Minneapolis, for appellant Thompson-Yaeger, Inc.

O'Brien, Ehrick, Wolf, Deaner & Downing, Thomas E. Wolf and Steven S. Fuller, Rochester, for Pacific Indemnity Company, Royal Indemnity Company, Aetna Casualty and Surety Company, Birmingham Fire Insurance Company, Home Insurance Company of New York and State Farm Insurance.

Thomas E. Wolf, Rochester, for Pacific Indemnity Company, Aetna Life & Casualty Company, Royal Indemnity Company, Corrigan Properties, Inc., Royal Shoe Repair, Inc., Snyder's Drug Store, Inc., State Farm Fire and Casualty Co., and Joseph Suchomel d/b/a The Pub.

Patterson & Restovich, and George Restovich, Rochester, for Earl B. Hoglund.

Van Eps & Gilmore and Chantry, Duane E. Arndt and Donald Chantry, Minneapolis, for Tjernlund Manufacturing Company.

Robert M. Wattson, Lawrence Zelle and Judith Rogosheske, Robins, Davis & Lyons, Minneapolis, David T. Bishop, Michaels, Bishop, Seeger & Rosenblad, Rochester, for Frerichs Our Own Hardware, Inc.

William C. Schacht, Schacht, Kerr & Steimer, Rochester, for Draper & Kramer, Inc.

Richard B. Allyn, Sol. Gen., St. Paul, for State.

SHERAN, Chief Justice.

This litigation arises out of a 1971 fire that destroyed a portion of a shopping center in Rochester, Minnesota. Plaintiffs are either tenants or the insurers of tenants; all seek recovery from four principal defendants for damages suffered by reason of that fire. Defendants are Yale Engineering, Inc., Thompson-Yaeger, Inc., Tjernlund Manufacturing Co., and Frerichs Our Own Hardware, Inc. Thirteen actions were commenced in the district court, and all were consolidated for trial. The issues were bifurcated, and the matters came on for trial before the court and a jury of six on the issue of liability. The case was submitted upon a special verdict. The jury found all three of the appealing defendants negligent. Judgment was entered accordingly.

Yale and Frerichs appeal from the judgment and from the denial by the trial court of their respective motions for amended findings of fact, conclusions of law, and order for judgment, judgment n. o. v., or a

new trial. Thompson-Yaeger has filed a notice of review in each of these cases. By order of this court the various appeals were consolidated for hearing and argument. Additionally, we ordered consolidated with these cases an appeal in a separate action for damages initiated by another of the tenants of the shopping center not a party to the original actions. In light of the verdict in the first cases, that tenant moved for summary judgment, arguing that the defendants were collaterally estopped from denying their liability. The trial court granted summary judgment, and defendants Yale and Frerichs appealed from that judgment.

Viewing the evidence, as we must, in a light most favorable to the verdict, the facts appear to be as follows:

On February 21, 1971, a fire destroyed the south end of the Miracle Mile Shopping Center in Rochester, Minnesota. This was a strip-type shopping center, with all of the stores located in a row. The Rochester Fire Department arrived in response to an alarm. The first engine to reach the center reported light smoke coming from the area of the Camera Center, located adjacent to Frerichs' hardware store. Upon further investigation, a small area of flame was observed in the rear of Frerichs' sporting goods department, near a duct coming from the furnace room. The fire spread quickly, ultimately destroying all of the stores to the south of Frerichs, and some located to the north. Other establishments suffered smoke and water damage.

The exact point of origin of the fire was determined by Chief Smith of the Rochester Fire Department to have been in the furnace room of Frerichs, on the north wall, in the east corner, behind the furnace. This point was directly opposite the "clean-out door" on the rear of the furnace. Smith's opinion was concurred in by two other expert witnesses, Dennis Michaelson, a consulting chemist employed regularly as a fire investigator, and Phillip Anderson, a consulting engineer.

Three theories, none exclusive of the others, were advanced as to why the fire be-

gan. The principal theory was that because the furnace was installed within a few inches of the wall where the fire started, the heat generated caused the formation of pyrophoric carbon [1] on the studs immediately behind the sheetrock of the wall. Eventually this "charcoal" ignited, causing the fire, which then spread to the interior of the wall and beyond. Another theory postulated was that this process of carbonization was accelerated by an increased temperature of the rear access door, which was in turn caused by intermittent ignition of the furnace resulting in incomplete combustion of the oil blown into the furnace. This oil landed on the hot access door and ignited, raising the temperature of the door further. The final theory presented was that "combustible materials" (consisting primarily of paper and cardboard boxes) stored near the furnace ignited, with the flames finding their way into the wall studs. The boxes also purportedly blocked the cold air return, further raising the operating temperature of the furnace and contributing to the carbon formation.

Several parties were named as defendants. Yale Engineering installed the furnace which allegedly caused the fire. The installation was completed in 1953. As installed (within inches of the wall) the furnace violated applicable building codes and the manufacturer's instructions. The trial court ruled that Yale was negligent as a matter of law; the jury found that this negligence accounted for 80 percent of the causation of the fire.

Thompson-Yaeger, Inc., serviced the furnace from approximately 1968 to January 8, 1971. On this last date, an employee of Thompson-Yaeger installed a new oil pump and adjusted the nozzle assembly and the electrical ignition system. Allegedly he made the adjustments improperly, causing the intermittent ignition which resulted in surface combustion on the rear access plate of the furnace, and causing an increase in temperature. The jury found Thompson-Yaeger negligent, and apportioned 10 percent of the causation to this negligence.

Frerichs Our Own Hardware, Inc., was the tenant occupying the premises where the furnace was located. Frerichs had entered into a 10-year lease for the premises with the owner of the center, Corrigan Properties, Inc. As a part of that lease, Frerichs agreed to maintain and repair the furnace, and it employed Thompson-Yaeger to perform the services. Allegedly, employees of Frerichs placed waste paper and cardboard boxes in close proximity to the furnace (particularly on a small ledge behind the furnace near the access door) which ignited and contributed to the fire. Additionally, the boxes and waste allegedly blocked the cold air return to the furnace, causing an increase in the furnace's operating temperature. The jury found Frerichs negligent, and apportioned 10 percent of the causation to this negligence.

Tjernlund Manufacturing Co. manufactured the furnace installed by Yale in the shopping center. Tjernlund's original posture was that of a defendant and third-party defendant, but pursuant to a settlement agreement reached between Tjernlund, Frerichs, and the plaintiffs prior to trial (see discussion, *infra*) the plaintiffs' claims against Tjernlund were dismissed, leaving it as a third-party defendant of Yale and Thompson-Yaeger. Allegedly, Tjernlund was negligent in failing to provide adequate warnings regarding installation and breached certain warranties. The jury found that Tjernlund was not negligent. The warranty theories were not submitted to the jury.

Corrigan Properties, Inc., owned the shopping center and had engaged Draper &

---

1. Pyrophoric carbon is literally "self-igniting" carbon. As used in this case, the term indicates carbonization of wood (the wall studs) into something resembling very flammable charcoal. Pyrophoric carbon is formed from wood as a result of periods of time during which the wood is subjected to higher than normal heat, which drives off vapor (mainly water) from the wood. The wood becomes carbonized and has a greatly lowered ignition temperature. In this case, because of the proximity of the furnace to the wall, the studs were literally baked until they resembled charcoal in part, and the increased temperature is alleged to have ultimately caused this carbon to ignite.

Kramer, Inc., as its managing agent. By third-party complaints, Yale and Thompson-Yaeger sought contribution and indemnity from them. The trial court directed verdicts in favor of Corrigan and Draper & Kramer.

Numerous instances of error are asserted on appeal by the parties. We have considered those instances of error asserted which we do not address explicitly and find them to be without substantial merit. We view these as being the pertinent issues on appeal:

(1) Does the statute of limitations of Minn.St. 541.051 apply to the conduct of Yale Engineering, and if so, is the statute constitutional?

(2) Was the settlement agreement entered into by certain of the parties prior to the trial valid, and did the trial court's treatment of that agreement deny the nonagreeing defendants a fair trial?

(3) Were the defendants nonetheless denied a fair trial because of misconduct on the part of the court and opposing counsel?

(4) Was there a sufficient basis of competent evidence to support both the jury verdict and the court's findings?

(5) Was summary judgment properly granted upon the doctrine of collateral estoppel?

1. *Applicability and Validity of Minn.St. 541.051.*

Minn.St. 541.051 provides, in pertinent part:

"Subdivision 1. Except where fraud is involved, no action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision, or observation of construction or construction of such improvement to real property more than two years after dis-covery thereof, nor, in any event more than ten years after the completion of such construction. This limitation shall not be applied in favor of any person in actual possession and control as owner, tenant, or otherwise, of the improvement at the time the defective and unsafe conditions of such improvement constitutes the proximate cause of the injury for which it is proposed to bring an action.

"Subd. 2. Notwithstanding the provisions of subdivision 1, in the case of such an injury to property or the person, or such an injury causing wrongful death, which injury occurred during the tenth year after the completion of such construction, an action to recover damages for such an injury or wrongful death may be brought within one year after the date on which such injury occurred, irrespective of the date of death, but in no event may such an action be brought more than 11 years after the completion of such construction."

The trial court found that the installation by Yale was not "an improvement to real property," and thus the limitation of Minn.St. 541.051 did not apply. The court indicated its feelings, however, that if the statute did apply, it was "*not* unconstitutional."

We address first the issue of the statute's applicability.

The furnace in question sat upon a cube-shaped, 5-foot high sheetmetal housing which contained the cooling system for the building. That cabinet was designed and fabricated by Yale (as was the entire heating and cooling system). The furnace itself was a metal cabinet somewhat smaller than the cooling system, with duct work attached, and with a blower motor affixed to the outside. The furnace was connected to numerous electric cables, oil pipes, and ducts. The trial court was of the opinion that the furnace "actually [differed] little from an ordinary space heater except for attached duct work," and was not an improvement to real property. The court applied the law of fixtures to conclude that the furnace was not an improvement, since

it could be easily removed and thus was not a part of the real property.

A review of the cases of other jurisdictions which have considered similar statutes (see discussion, *infra*) reveals that in only four of those cases was there an issue as to whether the construction was an "improvement" to realty.[2] In only one of those cases did the court base its determination on a fixture law analysis.[3]

■ While we have in the past stated that a rule of strict construction is appropriate in interpreting this statute, *Kittson County v. Wells, Denbrook & Assoc. Inc.,* Minn., 241 N.W.2d 799 (1976), we must still strive to give effect to the plain meaning of the words of the statute without resort to technical legal constructions of its terms. This same position has been adopted by our sister state Wisconsin. When faced with the task of interpreting the phrase "improvement to real property" in a statute substantially similar to Minn.St. 541.051, the Wisconsin Supreme Court avoided the vagaries of fixture law and sought to determine the statute's meaning "on the basis of the common usage of language," *Kallas Millwork Corp. v. Square D Co.,* 66 Wis.2d 382, 386, 225 N.W.2d 454, 456 (1975).

Recently, faced with the task of deciding the meaning of "improvement" to realty as used in Minn.St. 514.01 (relating to mechanics liens) in *Kloster-Madsen, Inc. v. Tafi's, Inc.* 303 Minn. 59, 226 N.W.2d 603 (1975), we adopted a common-sense interpretation as given in Webster's Third New International Dictionary (1971) p. 1138 and found that by definition an improvement is "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the proper-

ty more useful or valuable as distinguished from ordinary repairs." 303 Minn. 63, 226 N.W.2d 607.

■ The same common-sense interpretation should be made of the phrase "improvement to real property" as it is used in the instant statute. Applying that definition to the facts of this case, we hold that the installation of the furnace by Yale constituted, as a matter of law, the construction of an improvement to real property.

Having determined that the statute applies to Yale's conduct, we are faced squarely with the question of the constitutional validity of the statute.

Statutes similar to Minn.St. 541.051 have been enacted by numerous states. See, Comment, 18 Catholic U.L.Rev. 361. Traditionally courts viewed the potential liability of building and construction contractors to third parties as ending when their work was completed and accepted by the owner. Among the various justifications advanced for such a rule were lack of privity between the contractors and the third parties, foreseeability, and public policy. See, generally, Annotation, 58 A.L.R.2d 865. Such a rule of nonliability was severely criticized and has slowly been abrogated. See, Prosser, Torts (4 ed.) §§ 93, 104. Minnesota expressly adopted a rule of liability to third parties on the part of building contractors in *Murphy v. Barlow Realty Co.,* 206 Minn. 527, 289 N.W. 563 (1939). This rule, coupled with holdings in some cases that the statute of limitations does not begin to run until the wrong giving rise to that action is discovered, resulted in greatly increased exposure of architects, engineers, and contractors over an extended period of time. The legislative response in numerous states was the enactment of statutes similar to

---

**2.** See, *Yakima Fruit and Cold Storage Co. v. Central Heating and Plumbing Co.,* 81 Wash.2d 528, 531, 503 P.2d 108, 110 (1972) (the court in affirming a summary judgment, stated that "it cannot be reasonably concluded" that a refrigeration system in a cold-storage warehouse was anything but an improvement to real estate); *Smith v. Allen-Bradley Co.,* 371 F.Supp. 698 (W.D.Va.1974) (the court found that a 5-ton die-cutting machine was a "fixture," despite evidence that the machine could be readily moved); *Rosenberg v. Town of North Bergen,* 61 N.J. 190, 293 A.2d 662 (1972) (the court found defective street pavement to be an improvement to realty); *Kallas Millwork Corp. v. Square D Co.,* 66 Wis.2d 382, 225 N.W.2d 454 (1975) (the court concluded that a fire sprinkler system was an improvement to realty).

**3.** *Smith v. Allen-Bradley Co., supra.*

Minn.St. 541.051, which in effect nullify any cause of action which is not asserted within the statutory time limit. *Kittson County v. Wells, Denbrook & Assoc. Inc.*, Minn., 241 N.W.2d 799 (1976).

In this appeal, plaintiffs attack the constitutionality of the statute, asserting variously that it constitutes a denial of equal protection, is special legislation, and is a denial of due process of law.

Fifteen courts have ruled on the constitutionality of statutes similar to Minn.St. 541.051. In ten cases the statutes have been upheld. *Arkansas, Carter v. Hartenstein*, 248 Ark. 1172, 455 S.W.2d 918 (1970), appeal dismissed, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971); *California, Regents of the U. of Calif. v. Hartford Acc. & Indem. Co.*, 59 Cal.App.3d 675, 131 Cal.Rptr. 112 (1976), hearing granted by California Supreme Court; *New Jersey, Rosenberg v. Town of North Bergen*, 61 N.J. 190, 293 A.2d 662 (1972); *Oregon, Josephs v. Burns*, 260 Ore. 493, 491 P.2d 203 (1971); *Pennsylvania, Freezer Storage, Inc. v. Armstrong Cork Co.*, 234 Pa.Super. 441, 341 A.2d 184 (1975); *Tennessee, Agus v. Future Chattanooga Development Corp.*, 358 F.Supp. 246 (E.D.Tenn.1973), cited with approval, *Watts v. Putnam Co.*, 525 S.W.2d 488 (Tenn.1975); *Utah, Good v. Christensen*, Utah, 527 P.2d 223 (1974); *Virginia, Smith v. Allen-Bradley Co.*, 371 F.Supp. 698 (W.D.Va.1974); *Washington, Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*, 81 Wash.2d 528, 503 P.2d 108 (1972). (In three other states similar statutes have been interpreted without any discussion by the courts of constitutionality: *Louisiana, Carr v. Mississippi Valley Elec. Co.*, 285 So.2d 301 [La.App.1973]; *Nevada, Nevada Lakeshore Co. Inc. v. Diamond Electric, Inc.*, 89 Nev. 293, 511 P.2d 113 [1973]; *New Hampshire, Deschamps v. Camp Dresser & McKee, Inc.*, 113 N.H. 344, 306 A.2d 771 [1973]). In five states similar statutes have been found to be unconstitutional: *Alabama, Bagby Elev. & Elec. Co. Inc. v. McBride*, 292 Ala. 191, 291 So.2d 306 (1974); *Hawaii, Fujioka v. Kam*, 55 Haw. 7, 514 P.2d 568 (1973); *Illinois, Skinner v. Anderson*, 38 Ill.2d 455, 231 N.E.2d 588 (1967); *Kentucky, Saylor v. Hall*, 497 S.W.2d 218 (Ky.1973); *Wisconsin, Kallas Millwork Corp. v. Square D Co.*, 66 Wis.2d 382, 225 N.W.2d 454 (1975).

█ We have reviewed these cases carefully and are convinced that the better reasoned position is embodied in the decisions which hold such statutes to be unconstitutional because they grant an immunity from suit to a certain class of defendants, without there being a reasonable basis for that classification. We find the discussions in *Skinner v. Anderson, supra, Fujioka v. Kam, supra*, and *Kallas Millwork Corp. v. Square D Co., supra*, particularly thorough on this point and do not feel compelled to elaborate further, except to state that we too can see no basis for including within the protection of the statute persons who construct or design improvements to real estate, and excluding other persons against whom third parties might bring claims should they incur injury, such as owners and material suppliers. Legislative classifications must apply uniformly to all persons who are similarly situated, and the distinctions which separate those who are included within a classification from those who are not must be natural and reasonable, not fanciful and arbitrary. *Schwartz v. Talmo*, 295 Minn. 356, 205 N.W.2d 318, appeal dismissed, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973); 3B Dunnell, Dig. (3 ed.) § 1700. It appears that the statute contravenes this prohibition in that it grants a special immunity to persons within its terms, without a rational basis for regarding those persons as a distinct and separate class.

2. *Validity and Effect of Settlement Agreement.*

█ Prior to commencement of the testimony a settlement was arrived at concerning a portion of the claims. The jury (which had been impaneled and sworn) was excused for the day, and the court convened an in camera hearing at which the terms of the agreement were dictated into the record.

All of the plaintiffs—Tjernlund, Frerichs, Corrigan Properties, and Draper & Kramer—agreed that Tjernlund's liability would be limited to $100,000 and Frerichs' to $140,000. The money would be paid over to plaintiffs, the claims of plaintiffs against Tjernlund and Frerichs would be dismissed, these two defendants would dismiss their mutual cross-claims, and Tjernlund would dismiss its third-party claims against Corrigan Properties and Draper & Kramer. The cross-claims of Tjernlund and Frerichs against Yale and Thompson-Yaeger would be maintained. No release would be executed, and all of the parties would remain in the litigation. It was further agreed that in the event that the jury returned a verdict by which either Tjernlund or Frerichs had no liability (which it did with respect to Tjernlund) then the sums paid over would be repaid. All of the parties to the agreement concurred that these terms comprised in essence their agreement. An extended discussion of the nature of the agreement and its effect ensued.

The agreement was subsequently reduced to writing, and in written form it contained essentially the same terms as those dictated into the record. Some additional provisions were, however, included. While appellants contend that these provisions constituted substantial variations from the oral agreement, it is clear that they merely provided for the mechanics of the payment and repayment and did not alter the substance of the agreement.

The parties refer to this agreement in their briefs as either a "Mary Carter" settlement or a "loan-receipt." It seems to fall outside either classification, but more closely resembles a loan-receipt agreement than anything else.

Mary Carter settlement agreements receive their name from the case of *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla. App.1967). The term was coined by the District Court of Appeals of Florida in *Maule Industries, Inc. v. Rountree*, 264 So.2d 445 (Fla.App.1972), remanded, 284 So.2d 389 (Fla.1973). The district court said:

"The term arises from the agreement popularized by the case of *Booth v. Mary Carter Paint Co.*, Fla.App.1967, 202 So.2d 8, and now appears to be used rather generally to apply to any agreement between the plaintiff and some (but less than all) defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants." 264 So.2d 446, note 1.

Other essential provisions which earmark a Mary Carter agreement are that the fact that the agreement has been entered into and its terms are kept secret from both the nonagreeing parties and the court, that the defendants remain in the lawsuit as defendants, and that the plaintiff is guaranteed some minimum recovery. The collusive nature of such agreements and the fraud they tend to work upon both the nonagreeing parties and the courts have been severely criticized. See, 25 U. of Fla.L.Rev. 762; 47 So.Cal.L.Rev. 1393; *Ward v. Ochoa*, 284 So.2d 385 (Fla.1973).

About the only aspects of the instant agreement which resemble a Mary Carter-type agreement are the limitation-of-liability provision and the provision for varying the amount the agreeing defendants will pay. The most objectionable aspects, secrecy and collusion, are missing. Unlike a true Mary Carter agreement, the agreement here was fully disclosed to the court and nonagreeing parties, and the claims of plaintiffs against defendants were dismissed.

Likewise it seems inappropriate to categorize this agreement as a loan-receipt, although it possesses many of the characteristics of that genre. As originally developed, loan-receipt agreements were devices used between insurers and insureds to allow an insured who could not otherwise afford it to maintain an action against third parties to recover amounts his insurer would otherwise be obligated to pay. Such efforts to have the insured in essence seek to recover

the insurer's subrogation interest often ran afoul of "real party in interest" statutes. The loan-receipt was a method by which the insured was (albeit fictitiously) the real party in interest. See, generally, Annotation, 13 A.L.R.3d 42. Such devices have been accepted in Minnesota. See, *Blair v. Espeland,* 231 Minn. 444, 43 N.W.2d 274 (1950).

The use of loan-receipt agreements has been recognized in other jurisdictions. In transactions between plaintiffs and one or more joint tortfeasors the agreements have often been used as a device to gain de facto contribution where not authorized by law. See, *Reese v. Chicago, Burlington & Quincy R. Co.,* 55 Ill.2d 356, 303 N.E.2d 382 (1973). However, another, more laudatory, purpose of such agreements is to allow some measure of recompense for an injured plaintiff, during often protracted litigation, rather than force the plaintiff to wait until all proceedings, including the appeals, are completed. See, *Northern Indiana Public Service Co. v. Otis,* 145 Ind.App. 159, 250 N.E.2d 378 (1969).

The instant agreement does possess certain characteristics of a loan-receipt—the monies are paid over to plaintiffs immediately and are to be repaid out of the recovery had, if any, from the nonagreeing defendants. There is the additional and logical provision that in return for this "advance payment" the defendants gain an upper limit on their liability.

The greatest difficulty caused by pretrial settlement agreements is their effect on the adversary nature of the litigation. This fact was recognized by the court in *Reese v. Chicago, Burlington & Quincy R. Co., supra.* The court said:

> "Defendant * * * argues that the use of loan agreements tends to undermine the adversary nature and integrity of the proceedings against the remaining defendant. To a limited extent, we agree. It seems not unlikely that, where a defendant has executed a loan-receipt agreement with a plaintiff who thereupon dismisses that defendant and proceeds against the remaining ones, the employees and witnesses of the dismissed defendant may be substantially more cooperative with plaintiff than would otherwise be true, since any recovery by that defendant of the loaned amount is frequently contingent upon plaintiff's success against the remaining defendants. To some degree the same may be said of many third-party actions. But we believe adequate protection for those defendants exists if by cross-examination they are permitted to establish that a witness knows of the existence of a loan agreement, and, if so, that the witness may be biased or prejudiced as a result thereof." 55 Ill.2d 364, 303 N.E.2d 387.

We have also voiced our displeasure at "secret settlements" and the unfairness they promote. See, *Faber v. Roelofs,* 298 Minn. 16, 212 N.W.2d 856 (1973).

Disclosure and an adequate opportunity to cross-examine insure that the adversary process is not so subverted as to deny a fair trial. In the instant case the agreement was disclosed to the court and counsel before the jury heard any testimony, and arguments made regarding the discoverability of the agreement seem inapposite. Additionally, counsel for Yale fully argued the effect of the agreement on the adversary position of the other parties to the jury, without objection. Even after the agreement, the posture of the parties was not changed substantially. Tjernlund and Frerichs would have had interests adverse to those of the other defendants irrespective of the agreement and would have endeavored to place as much of the burden on them as possible.

Despite assertions by appellants to the contrary, it seems that the agreement in the instant case did not affect the liability of the nonassenting defendants. As noted above, the claims of Tjernlund and Frerichs for contribution and indemnity from Yale and Thompson-Yaeger were limited to the amounts paid by the former two parties under the agreement; Yale and Thompson-Yaeger must pay no more than their own apportioned share of the damages.

■ Appellants also argue that the agreement constituted a release by plain-

tiffs, and, being the release of some joint tortfeasors, constituted a release of all of them. This argument is not persuasive. The agreeing parties made it clear that the agreement was not a release. As we stated in *Gronquist v. Olson,* 242 Minn. 119, 64 N.W.2d 159 (1954), agreements of settlement, no matter what form they take, act to discharge all joint tortfeasors only if it appears to be the intention of the parties that sums paid under an agreement constitute full compensation to the plaintiff for the damages sustained; if there is only partial compensation, then the plaintiff remains free to pursue his remedy against the other joint tortfeasors. The amounts paid, however, do constitute a pro tanto reduction in liability of the joint tortfeasors. Cf. Minn.St. 604.01.

■ Appellants' assertions that it was error for the trial court not to admit the agreement itself into evidence seem equally unfounded. The jury was advised of the fact of the settlement both in the court's preliminary charge and in the closing instruction. As noted previously, the effect of the agreement was argued to the jury. No useful purpose would have been served by admitting the written agreement itself into evidence.

■ It is not proper or desirable for this court to condone or condemn types of settlement agreements generically. Rather, we must examine them on a case-by-case basis and assess their validity and effect. If there is no secrecy surrounding a settlement, and if it does not act to prejudice the rights of the nonagreeing parties, then we see no general prohibition against such agreements. In this case, no prejudice appears to have resulted to any of the parties, and we thus find nothing objectionable in the settlement reached.

### 3. Misconduct of Court and Counsel.

■ Appellants Yale Engineering and Thompson-Yaeger further assert that they were denied a fair trial because of prejudicial comments and conduct on the part of the trial court and other counsel. These allegations are independent of the claimed prejudice resultant from the asserted lack of adversity among the parties. We have considered the instances of alleged misconduct cited by the parties and find their contentions to be without merit.

### 4. Sufficiency of Evidence.

■ Appellants contend as to each of them that there was not sufficient evidence upon which the jury could base its findings.

The theories of liability presented were logical, not inconsistent, and seemingly supported by expert testimony and the physical evidence introduced at trial. Additionally, the trial court carefully considered the motions by appellants for judgment n. o. v., reviewed the evidentiary basis for the jury's findings, and determined that the verdict should stand. Viewing the evidence in a light most favorable to the verdict, we find that there is sufficient competent evidence which reasonably tends to support the jury's verdict.

■ Yale Engineering makes the further argument that the trial court improperly determined that Yale was negligent as a matter of law. The trial court based this determination upon its finding that Yale had violated certain ordinances of the city of Rochester which governed the installation of heating systems and provided for certain minimum clearances between furnaces and surrounding walls. While Yale argues at length that the more recent of two applicable ordinances repealed by implication the earlier ordinance, we do not agree. The trial judge found that the ordinance had been violated by Yale in installing the furnace. Based on the record, reasonable minds could not differ as to that finding. It is well settled that breach of a statute gives rise to negligence per se if the persons harmed by that violation are within the intended protection of the statute and the harm suffered is of the type the legislation was intended to prevent. *Osborne v. McMasters,* 40 Minn. 103, 41 N.W. 543 (1889); *Dart v. Pure Oil Co.,* 223 Minn. 526, 27 N.W.2d 555 (1947); *Zerby v. Warren,* 297 Minn. 134, 210 N.W.2d 58 (1973). This rule

is equally applicable to violations of ordinances. See, 13B Dunnell, Dig. (3 ed.) § 6976, and cases cited at note 53. The statute or ordinance imposes a fixed duty of care, so its breach constitutes conclusive evidence of negligence. *Zerby v. Warren, supra.* We hold that the trial court properly found as a matter of law that Yale was negligent in its installation of the furnace. In light of this conclusion, it is not necessary to discuss the other issues raised by Yale in this regard.

5. *Summary Judgment.*

█ Finally, it is asserted that the court improperly granted summary judgment on the issue of liability in the subsequent action brought by other tenants against the same defendants. Quite clearly, the issue in this second suit regarding liability was exactly the same as in the first—what or who was responsible for the fire. Defendants fully litigated that issue in the first suit and must be bound by the result. It would serve no purpose to deny the second claim and compel the parties to relitigate the issue of liability. Plaintiffs in the second suit stand in exactly the same position as the plaintiffs in the first suit. The facts of both cases and the issues involved being identical, summary judgment was properly granted. *Lustik v. Rankila,* 269 Minn. 515, 131 N.W.2d 741 (1964).

Judgment affirmed.

OTIS, Justice (dissenting).

I agree with the majority opinion in so far as it holds that the installation of the furnace by Yale was an "improvement to real property" within the meaning of Minn.St. 541.051. However, I dissent from the conclusion that there is no rational basis for granting immunity to those who construct or design improvements, while denying immunity to "owners." Accordingly, I would affirm the trial court's decision that the statute is constitutional, and reverse as to the liability of Yale who designed and fabricated the furnace, leaving only Thompson-Yaeger and Frerichs responsible for the damages.

By the time the case was submitted to the jury Thompson-Yaeger, which negligently serviced the furnace, and Yale were the only defendants left in the main action. Frerichs, the tenant which triggered the fire by leaving flammable material adjacent to the furnace, and Tjernlund, which manufactured the furnace, were third-party defendants from which the principal defendants sought contribution or indemnity. The jury exonerated Tjernlund and found Yale 80 percent negligent, and Thompson-Yaeger and Frerichs each 10 percent negligent.

1. Contrary to the facts from which the majority reasons, I respectfully suggest that there is in this case no discrimination against either the "owners" or "material suppliers." None of those held liable below fall into either of those categories. As a matter of sound judicial policy and fundamental law, in a decision considering so serious an issue as the constitutionality of a legislative enactment, I submit that those unaffected by the statute may not espouse the cause of others who may or may not be prejudiced in situations not here present. Basic judicial principles which require "standing" as a prerequisite to invoking the jurisdiction of the court, particularly on constitutional matters, should restrain us from passing on an issue where none of the parties has a stake in the outcome.

2. On the merits, however, there is no reason to assume that the statute was intended to exclude from immunity "material suppliers" who had a part in the design or construction. *Carter v. Hartenstein,* 248 Ark. 1172, 1175, note, 455 S.W.2d 918, 920 (1970); *Rosenberg v. Town of North Bergen,* 61 N.J. 190, 201, 293 A.2d 662, 668 (1972); *Reeves v. Ille Elec. Co.,* Mont., 551 P. 647 (1976). In *Regents of U. of Calif. v. Hartford Acc. & Indem. Co.,* 59 Cal.App.3d 675, 131 Cal.Rptr. 112, 140 (1976), hearing granted by Supreme Court of California, the court of appeal stated:

"It has been assumed in the cases voiding the legislation that materialmen are not relieved, whereas contractors and architects are granted repose after expiration of the statutory period. That may

be true under the Hawaiian statute, but we are not prepared to say that a supplier is not a 'person who * * * performs * * * construction of an improvement to real property' when he furnishes material or equipment which he knows is to be incorporated in that improvement."

But whether or not he takes part in the "design" of the improvement, when the issue is before us a persuasive argument can be made that a materialman *does* come within the definition of "any person performing * * * construction," and consequently he is *not* excluded from the favored class in a manner which renders that classification impermissible. Certainly one who furnishes structural supplies, plumbing, or heating or electrical equipment, fashioned for specific use in erecting a building, is a person "performing" an integral part of the construction process. It would be difficult for us to hold otherwise. This leaves only the owner, and those in possession of the property, responsible for maintaining the building in a safe condition after a period of 10 years has uneventfully elapsed. For reasons which a number of courts and commentators have articulated, this is as it should be.

3. There is evidence that 84 percent of all claims against architects for faulty design are brought within 4 years of the completion of their professional services. Comment, 18 Catholic U.L.Rev. 361, 366.[1] The likelihood of *hidden* defects, attributable to design, emerging after 10 years is probably slight. But again, that is not the case before us. The hazardous conditions created by Yale were open and obvious, even to a layman. The furnace was installed immediately adjacent to one wall, and 6 to 8 inches from another, both walls constructed of combustible material. Another furnace in an adjoining store was placed in juxtaposition to the Frerichs' furnace so that one wall was exposed to heat from both sides. Under the circumstances even a superficial inspection and observation made it the duty of the owners and tenants to take corrective measures. In this highly volatile atmosphere Frerichs permitted paper and cartons to be stored in a 4- or 5-inch space between the furnace and the wall while the owner took no effective measures to eliminate that obvious and imminent danger. This, then, is the classic case where the owner has had every opportunity to observe the defective design almost as soon as the work was completed but has failed to re-

1. The following table was presented in 1967 to a committee of Congress by an architectural malpractice insurer based on 570 pending suits (Comment, 18 Catholic U.L.Rev. 361, 367):

Study of Distribution of Claims by Length of Time

| Number of years after completion of project before claim is brought | Number of claims | Percentage of claims | Cumulation percentage of claims |
|---|---|---|---|
| 1 | 215 | 37.7 | 37.7 |
| 2 | 106 | 18.6 | 56.3 |
| 3 | 96 | 16.8 | 73.1 |
| 4 | 64 | 11.2 | 84.3 |
| 5 | 31 | 5.4 | 89.7 |
| 6 | 18 | 3.3 | 93.0 |
| 7 | 28 | 4.9 | 97.9 |
| 8 | 5 | .8 | 98.7 |
| 9 | 3 | .5 | 99.2 |
| 10 | 2 | .4 | 99.6 |
| 11 | 0 | . . . | . . . |
| 12 | 0 | . . . | . . . |
| 13 | 1 | .2 | 99.8 |
| 14 | 1 | .2 | 100.0 |
| 15 | 0 | . . . | . . . |
| Total | 570 | 100.0 | . . . |

quire that it be corrected, and has slept on its rights for 18 years. Both the owner and the tenant were in a position to prevent the very catastrophe which occurred. It would not be inequitable to permit them to bear the loss in circumstances of this kind.

4. The benefits of imposing responsibility on owners and occupants to inspect and correct *patent* defects in my opinion greatly outweigh the occasional hardship resulting from denying indemnity from negligent architects and contractors after 10 years have elapsed. As to *latent* defects there are different policy considerations. Nevertheless there are compelling reasons for permitting immunity even in those situations. Some 40 states have adopted statutes similar to § 541.051. Two-thirds of the courts which have considered them have recognized a rational basis for shifting responsibility to owners. Without such a statute the potential liability of architects and contractors would continue indefinitely, almost in perpetuity. Here the event occurred 18 years after the building had been completed, inspected, and accepted by the owners. Meanwhile, Yale had no right to enter and inspect the premises or to control the service and operation of the furnace which it installed. During those years there was every opportunity for neglect, abuse, poor maintenance, mishandling, improper modification, and unskilled repair. The task of distinguishing between a failure of the system attributable to faulty design and construction, as against faulty maintenance and operations, then becomes almost impossible for factfinders to undertake.

5. Statutes of limitations where no vested rights have been forfeited have uniformly been upheld. Within the 10-year period under § 541.051 the injured party has 2 years after discovery to bring an action. After 10 years no cause of action exists. Such protection is essentially a trade-off for the greatly increased exposure of architects and contractors which has stemmed from the denial of the defense of privity as to third-party claims, and the extension of their liability by the adoption of a rule that discovery of the defect commences the prescribed period of limitations, rather than the time when the work was completed. This concession seems eminently fair in light of the problems of proof presented after 10 years. Here after 18 years, records of the defendants might well have been destroyed or lost; those who performed the work may no longer be available to testify; and inevitably memories will have dulled by passage of time. These are the classic reasons for all statutes of limitations. The usual period is 6 years. The likelihood of prejudice resulting after 10 years is almost geometrically increased.

6. Of the ten states which have held statutes such as § 541.051 constitutional, opinions of the Arkansas, New Jersey, and California courts are particularly relevant. In *Carter v. Hartenstein, supra,* a 4-year statute of limitations was held to be constitutional in barring a claim against an architect and contractor for faulty design of an elevator which caused the death of a passenger. The court held that it was not a denial of equal protection to require the owner to accept responsibility for the condition of the premises. To permit no limitation in perpetuity against one who designs or erects a structure would discriminate against professional builders, the court said. But it concluded by observing, "This case has nothing to do, as presented, with questions of *concealed* defects, imminently and inherently dangerous, or prospective liability." 248 Ark. 1176, 455 S.W.2d 921. (Italics supplied.)

The New Jersey court in *Rosenberg v. Town of North Bergen, supra,* was dealing with a defective highway built by defendants 30 years before plaintiff was injured. The court held that a 10-year limitation was a "reasonable measure of protection" against the increased exposure of architects and contractors arising from the revised rules as to privity and discovery. 61 N.J. 198, 293 A.2d 666. "There comes a time when [the defendant] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and he ought not to be called on to resist a claim when 'evidence has been lost, memories have faded, and witnesses have disappeared.'" Note, 63 Harv.L.Rev. 1177, 1185.

California also has a 10-year statute which was sustained in *Regents of U. of Calif. v. Hartford Acc. & Indem. Co., supra.* There, *latent* deterioration occurred to a building because of a deficiency in design. The court of appeal held that after 10 years the statute "cuts off the right of action before it accrues" without a denial of any constitutional rights. 131 Cal.Rptr. 132. The court further noted:

" * * * [I]nsofar as the liability to the property of third persons is concerned * * * the effect of the section is to make the owner, tenant or other possessor of the property responsible for insuring against the loss, and to relieve those mentioned of the necessity of securing insurance which will cover contingent liabilities for an infinite period of time. It is arguable that in the long run the distribution of those risks over persons who are responsible for improvements over ten years old will tend to lessen the costs of insurance to the favored classes, and that the resultant costs of construction to those who use the services of that class. The ten-year period that the exceptions in subdivision (f) of the statute are reasonably adapted to protecting the owner from the results of most shoddy work. The courts long recognized the sharing of risks through liability insurance, and no reason suggests itself why the legislators are not as capable of planning for such eventualities as judges. The fact that the former are more responsive to popular will may be an advantage in insuring greater flexibility of systems of apportioning loss which meet with popular disapproval than is the case with the judiciary." 131 Cal.Rptr. 140.

I find persuasive the California court's reasoning that the apportioning of risks is a proper and a constitutionally permissible legislative function with which the judiciary should not interfere.

I would affirm the trial court's determination that Minn.St. 541.051 is constitutional.

ROGOSHESKE and MacLAUGHLIN, JJ., took no part in the consideration or decision of this case.