Einar E. Hanson, Jonathan A. Edin, Nathaniel J. Weimer, Strobel & Hanson, P.A., Hudson, Wisconsin; and John D. Hagen, Jr., Minneapolis, Minnesota (for appellant)
Timothy P. Tobin, Brock P. Alton, Gislason & Hunter, LLP, Minneapolis, Minnesota (for respondent Housing Partners III-Lofts LLC)
Jonathon M. Zentner, Steven J. Erffmeyer, Jeffrey M. Markowitz, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota (for respondent Kraus-Anderson Construction Company)
Keith J. Kerfeld, Wade T. Johnson, Tewksbury & Kerfeld, P.A., Minneapolis, Minnesota (for respondent Doody Mechanical, Inc., and Metropolitan Mechanical Contractors, Inc.)
Matthew W. Moehrle, Kevin F. Gray, Rajkowski Hansmeier, Ltd., St. Cloud, Minnesota (for respondent Kenneth Kendle, P.E.)
Lindsey J. Woodrow, Waldeck Law Firm, P.A., Minneapolis, Minnesota (for respondent M & E Engineering, Inc.)
Considered and decided by Johnson, Presiding Judge; Ross, Judge; and Tracy M. Smith, Judge.
JOHNSON, Judge *623 This appeal concerns a condominium development that consists of two buildings. Alleged defects were discovered in the buildings. The homeowners' association sued the developer, the architect, the contractor, and three subcontractors. The district court granted summary judgment to all defendants on all of the association's claims on the ground that the claims are barred by the statutes of repose in Minnesota Statutes section 541.051.
We conclude that the district court did not err with respect to the association's common-law claims but that the district court erred in part with respect to the association's breach-of-statutory-warranty claims. We also conclude that the district court did not err by refusing to approve a settlement agreement between the association and the developer that would have allowed the association to pursue the developer's cross-claims against co-defendants. Therefore, we affirm in part, reverse in part, and remand for further proceedings.
FACTS
Village Lofts at St. Anthony Falls is a condominium development in northeast Minneapolis that consists of a seven-story building at 100 Second Street Northeast (known by the parties as Building A) and a six-story building at 150 Second Street Northeast (known by the parties as Building B). The developer was Housing Partners III-Lofts, LLC. Housing Partners hired Elness Swenson Graham Architects, Inc. (ESG), to be the architect for the development. Housing Partners hired the Kraus-Anderson Construction Company to be the general contractor.
Building A
Housing Partners and Kraus-Anderson entered into a written agreement with respect to Building A on April 23, 2001. Kraus-Anderson hired Doody Mechanical, Inc. (which later was acquired by Metropolitan Mechanical Contractors, Inc.) to design and build the plumbing and heating, ventilation, and air conditioning (HVAC) systems. Kraus-Anderson and Doody entered into a written agreement with respect to Building A on December 20, 2001. Doody hired Kenneth Kendle, P.E., to provide mechanical-engineering services for Building A.
On September 5, 2002, the City of Minneapolis issued a partial certificate of occupancy for Building A, which included the base building, public spaces, and one condominium unit. The city later issued partial certificates of occupancy for seven additional condominium units in 2002 and 30 condominium units in 2003. On November 4, 2003, the city issued a certificate of occupancy for the entire building, with the exception of two units. The city issued a certificate of occupancy for one of the last two units on July 20, 2006.
On October 4, 2002, Housing Partners created the Village Lofts at St. Anthony Falls Association, which is the plaintiff in this action and the appellant in this appeal, by executing and recording a declaration pursuant to the Minnesota Common Interest Ownership Act. See Minn. Stat. § 515B.2-101 (2018). Shortly thereafter, Housing Partners began to sell condominium units. The first warranty deed for a condominium unit in Building A was executed on October 10, 2002. The last warranty deed for a condominium unit in Building A was executed on March 25, 2005.
Building B
Housing Partners and Kraus-Anderson entered into a written agreement with respect *624 to Building B on May 30, 2003. Kraus-Anderson hired Doody to design and build the plumbing and HVAC systems for Building B. Kraus-Anderson and Doody entered into a written agreement with respect to Building B on September 29, 2003. Doody hired M & E Engineering, Inc., to provide mechanical-engineering services for Building B.
On September 24, 2004, the association amended its original declaration to include owners of condominium units in Building B. See Minn. Stat. § 515B.2-111 (2018). On October 14, 2004, the city issued a certificate of occupancy for all of Building B pursuant to a revised policy of issuing a single certificate of occupancy for an entire multi-unit building. The next day, ESG issued a certificate of substantial completion. The first three warranty deeds for condominium units in Building B were executed on October 19, 2004. The last warranty deed for a condominium unit in Building B was executed on June 5, 2006.
Discovery of Alleged Defects
On or about January 30, 2014, a resident in Building A notified the property manager that the floor in her condominium unit was discolored. The association hired an engineering firm, Encompass, Inc., to investigate. As part of its investigation, Encompass cut open a wall in the resident's condominium unit to inspect the fan coil stack, which is part of the HVAC system. Encompass observed a broken joint on the water pipe connected to the unit's fan coil stack. On March 28, 2014, Encompass issued a written report to the association. Encompass later discovered the same type of problem in other condominium units in Building A.
The following year, on May 22, 2015, the association provided written notice to Kraus-Anderson of the problems with fan coil stacks in Building A. In April 2015, Encompass discovered the same type of problem in condominium units in Building B. The association repaired pipes connected to the fan coil stacks in every condominium unit in both buildings at a cost of $842,585.
District Court Proceedings
On August 5, 2015, the association commenced this action against Housing Partners, Kraus-Anderson, and Doody. The association later amended its complaint to assert claims against ESG, Kendle, and M & E. In its second amended complaint, which was served and filed in May 2016, the association asserted the following claims: (1) negligence and breach of implied warranty against Housing Partners, Kraus-Anderson, and Doody; (2) breach of contract against Housing Partners; (3) breach of contract (on a third-party-beneficiary theory) against Kraus-Anderson and Doody; (4) breach of statutory warranties under Minnesota Statutes chapter 327A against Housing Partners and Kraus-Anderson; (5) negligence against ESG; (6) negligence against Kendle; and (7) negligence against M & E.
In April 2016, Kraus-Anderson moved for summary judgment on the ground that the association's claims against it are barred by the statutes of repose in section 541.051. ESG,[1] Doody, and Kendle (but not Housing Partners and M & E) joined in the motion with respect to the claims filed against each of them. M & E later filed its own motion for summary judgment.
On September 29, 2016, the district court filed a 45-page order in which it ordered summary judgment in favor of all defendants. Shortly thereafter, the association asked the district court by letter to amend its order on the grounds that Housing Partners had not moved for summary *625 judgment and that M & E's motion had not yet been considered. On October 5, 2016, the district court filed an amended order for summary judgment in favor of Kraus-Anderson, ESG, Doody, and Kendle.
While the summary judgment motions were pending, the association and Housing Partners negotiated a settlement agreement. The association's president signed a written settlement agreement on September 28, 2016, one day before the district court filed its first summary-judgment order. The agreement provides that Housing Partners is obligated to pay the association $675,000 in exchange for a release of the association's claims against Housing Partners. The agreement also provides that, because Housing Partners (which had ceased doing business in 2004) has insufficient funds to pay the entire settlement amount, it was obligated to make immediate payment to the association of only $10,000. The agreement further provides that Housing Partners will execute a promissory note in the amount of $665,000, which may be satisfied only from the proceeds of Housing Partners' cross-claims against its co-defendants. The agreement further provides that the association has the right to "step into the shoes" of Housing Partners to pursue its cross-claims.
On October 10, 2016, five days after the district court filed its amended summary-judgment order, the association notified the district court and the other parties that it had entered into a settlement with Housing Partners (although Housing Partners did not actually sign the agreement until October 19, 2016). On November 7, 2016, the association filed a motion for approval of the settlement agreement. Kraus-Anderson sought leave to conduct discovery concerning the proposed settlement. On April 14, 2017, the district court ordered the association and Housing Partners to respond to Kraus-Anderson's discovery requests. Shortly thereafter, Kraus-Anderson filed a motion to declare the settlement agreement invalid.
In September 2017, the district court filed an order making several rulings. The district court granted M & E's motion for summary judgment. The district court sua sponte granted summary judgment to Housing Partners on the association's claims. The district court also denied the association's motion for approval of its settlement agreement with Housing Partners. In December 2017, the district court directed the entry of a partial final judgment. See Minn. R. Civ. P. 54.02. The association appeals.
ISSUES
I. Are the association's common-law claims and statutory claims against defendants-respondents barred by the statutes of repose in Minnesota Statutes section 541.051 ?
II. Did the district court err by denying the association's motion for approval of its settlement agreement with Housing Partners?
ANALYSIS
I.
The association argues that the district court erred by ordering summary judgment on all of its claims. Specifically, the association contends that the district court erred in its application of the statutes of repose in Minnesota Statutes section 541.051.
A district court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and *626 that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03 (2017).[2] A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the non-moving party. Frieler v. Carlson Mktg. Grp., Inc. , 751 N.W.2d 558, 564 (Minn. 2008). In evaluating the evidence in the summary-judgment record, a district court must view the evidence in the light most favorable to the non-moving party. RAM Mut. Ins. Co. v. Rohde , 820 N.W.2d 1, 6 (Minn. 2012). This court applies a de novo standard of review to a district court's grant of a motion for summary judgment. Id. ; Day Masonry v. Independent Sch. Dist. 347 , 781 N.W.2d 321, 325 (Minn. 2010). A district court may sua sponte enter summary judgment for a party if, under the same circumstances, it would grant summary judgment on motion of a party. See Del Hayes & Sons, Inc. v. Mitchell , 304 Minn. 275, 230 N.W.2d 588, 591-92 (1975) ; Federal Land Bank v. Obermoller , 429 N.W.2d 251, 255 (Minn. App. 1988), review denied (Minn. Oct. 26, 1988).
A. Common-Law Claims
The association first argues that the district court erred by directing entry of summary judgment in favor of all defendants-respondents on its common-law claims of negligence and breach of contract. The association's argument challenges the district court's application of the statute of repose in section 541.051, subdivision 1(a), which, when the action was commenced, provided as follows:
Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property or against the owner of the real property more than two years after discovery of the injury, nor in any event shall such a cause of action accrue more than ten years after substantial completion of the construction ....
Minn. Stat. § 541.051, subd. 1(a) (2014) (emphasis added).[3] This paragraph contains both a statute of limitations and a statute of repose. The purpose of a statute of repose generally is to "avoid litigation and stale claims which could occur many years after an improvement to real property has been designed, manufactured and installed." Sartori v. Harnischfeger Corp. , 432 N.W.2d 448, 454 (Minn. 1988). In the absence of a statute of repose, litigation of stale claims would be hampered by the unavailability of witnesses, memory loss, and inadequate records. See id.
The district court determined that the association's common-law claims of negligence and breach of contract are barred by the statute of repose in Minnesota Statutes section 541.051, subdivision 1(a). The *627 district court determined that Building A and Building B are separate improvements to real property and that each building was substantially completed more than ten years before the association's cause of action accrued. The association challenges the district court's reasoning in three ways. We address each challenge in turn.
1. One Improvement or Two?
The association first argues that the district court erred by determining that Building A and Building B are two independent "improvement[s] to real property" for purposes of the statute of repose in section 541.051, subdivision 1(a). The association contends that the two buildings collectively are a single "improvement to real property."
The term "improvement to real property" is not defined in chapter 541. But the supreme court has defined the term for purposes of chapter 541 to mean " 'a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.' " Great Northern Ins. Co. v. Honeywell Int'l, Inc. , 911 N.W.2d 510, 516 (Minn. 2018) (quoting Pacific Indem. Co. v. Thompson-Yaeger, Inc. , 260 N.W.2d 548, 554 (Minn. 1977) ). The supreme court also has explained generally that in identifying the relevant "improvement to real property," courts should use a "common-sense interpretation" of that term. State Farm Fire & Cas. v. Aquila Inc. , 718 N.W.2d 879, 883-85 (Minn. 2006) ; Lietz v. Northern States Power Co. , 718 N.W.2d 865, 869 (Minn. 2006) ; Sartori , 432 N.W.2d at 451.
In this case, the district court determined that Building A and Building B independently satisfied the common-sense, common-law definition of an "improvement to real property." The district court further determined that "[s]eparate contracts were entered [into] for the construction of each building" and that the buildings "were constructed at separate times" with separate HVAC systems.
The association contends that the district court erred on the ground that the two buildings were intended to be parts of a single project. The association asserts that Housing Partners "always treated Village Lofts as a single entity" and marketed it as such to prospective owners. The association further asserts that Housing Partners' marketing materials promised that prospective owners in Building A would have access to amenities in Building B and that marketing materials showed prospective owners a scale model depicting both buildings. The association also emphasizes the "flexible" nature of a condominium association and its right to add real estate. See Minn. Stat. § 515B.2-106(a)(1) (2018). In response, respondents generally contend that the marketing of future improvements is not relevant to how the property was actually improved and constructed. They emphasize that the two buildings were governed by different contracts and built with different subcontractors.
The relevant statute is focused on "substantial completion of the construction ." See Minn. Stat. § 541.051, subd. 1(a) (emphasis added). Accordingly, we are focused on construction-related activities rather than designing and planning activities or the marketing of condominium units to prospective owners. The term "construction" is not defined in chapter 541, but the common meaning of the term, as it is used here, is, "[t]he action of framing, devising, or forming, by the putting together of parts; erection, building." The Oxford Universal Dictionary 378 (3d ed. 1964). Accordingly, we look to the factual record to *628 determine whether the construction-related activities involving Building A were intertwined with the construction-related activities involving Building B.
The evidence in the summary-judgment record indicates that the construction of Building A was distinct and separate from the construction of Building B. Housing Partners entered into separate written agreements with Kraus-Anderson, which were executed approximately 25 months apart. Similarly, Kraus-Anderson entered into separate written agreements with Doody, the plumbing and HVAC subcontractor, which were executed approximately 21 months apart. Likewise, Doody hired two different subcontractors for mechanical-engineering services-Kendle for Building A and M & E for Building B. The city issued the first certificate of occupancy for Building A approximately two years before it issued a certificate of occupancy for Building B. Notably, the construction of the two buildings did not overlap in a substantial way. The first event of record with respect to Building B-the execution of the construction agreement between Housing Partners and Kraus-Anderson-did not occur until May 2003, approximately eight months after the city began issuing certificates of occupancy with respect to Building A.
The association contends that both buildings are served by some common areas and amenities (such as an underground parking garage, an exercise room, and storage space) that were not completed until the construction of Building B. But the later completion of those common areas and amenities did not delay the occupancy of Building A. The statute of repose expressly states that "substantial completion" occurs at "the date when construction is sufficiently completed so that the owner or the owner's representative can occupy or use the improvement for the intended purpose." Minn. Stat. § 541.051, subd. 1(a). As it happened, the occupancy and use of Building A actually occurred substantially before the occupancy and use of Building B, notwithstanding the fact that certain common areas and amenities were completed later. Accordingly, the fact that certain common areas and amenities were built in conjunction with the construction of Building B does not alter our conclusion that the two buildings were built on significantly different schedules and were substantially completed on different dates. Even before the construction of Building B was completed, the construction of Building A "enhance[d] [the] capital value" of the real property on which it is situated and "ma[d]e the property more useful or valuable." See Great Northern Ins. Co. , 911 N.W.2d at 516 (quotations omitted).
Thus, the district court did not err by determining that Building A and Building B are two separate improvements to real property for purposes of the statute of repose in section 541.051, subdivision 1(a).
2. Substantial Completion of Building A
The association next argues that the district court erred by determining that the construction of Building A was substantially completed on the date of the first certificate of occupancy with respect to that building.
As stated above, section 541.051, subdivision 1(a), contains its own definition of the term "substantial completion of the construction": "the date when construction is sufficiently completed so that the owner or the owner's representative can occupy or use the improvement for the intended purpose." Minn. Stat. § 541.051, subd. 1(a). The issuance of a certificate of occupancy may serve as prima facie evidence of substantial completion.
*629 Rosso v. Hallmark Homes, Inc. , 843 N.W.2d 798, 802 (Minn. App. 2014). This is so because "a certificate of occupancy would never be issued before a structure's construction were completed." Id. Nonetheless, a certificate of occupancy "is not a necessary condition that has to occur before substantial completion" has occurred. Id.
The district court determined that the construction of Building A was substantially completed on September 5, 2002. The district court reasoned that the building was ready to be occupied by residents on this date and that units were ready for sale, as "many purchases were made and warranty deeds were recorded in the ensuing months." Given the district court's determination that the construction of Building A was substantially completed on September 5, 2002, and given the undisputed fact that the alleged defect in Building A was not discovered until, at the earliest, January 30, 2014, the district court concluded that the association's common-law claims are barred by the statute of repose in section 541.051, subdivision 1(a).
The association contends that the district court erred on the ground that "not all units [in Building A] were 'move-in ready' " before January 2004. The association does not identify a particular date by which the construction of Building A was substantially completed, but its principal brief suggests that the construction of Building A was not substantially completed until certificates of occupancy were issued for all of its condominium units.
We note that the statutory definition of "substantial completion" appears to contemplate a situation in which the owner of the improvement intends to "occupy or use the improvement for the intended purpose." See Minn. Stat. § 541.051, subd. 1(a). But Housing Partners did not intend to occupy or use Building A for its intended purpose; Housing Partners intended to sell individual condominium units to individual owners for their occupation and use and intended to transfer ownership of common areas to a homeowners' association. Given the statute's focus on the date when an improvement may be occupied or used for its intended purposes, it is appropriate to focus on the intent and purposes of individual purchasers of condominium units and the purposes of the homeowners' association, which had been established seven days before the first certificate of occupancy with respect to Building A.
Based on the first partial certificate of occupancy for Building A, which is dated September 5, 2002, defendants-respondents introduced prima facie evidence that the homeowners' association could then use the common areas of Building A for their intended purposes. See Rosso , 843 N.W.2d at 802. And the certificate is prima facie evidence that the individual owner of the one condominium unit for which the certificate was issued could then use that condominium unit for its intended purposes. See id. Similarly, subsequent certificates are prima facie evidence that the individual owners of the seven additional condominium units for which certificates of occupancy were issued in 2002, and the individual owners of the 30 condominium units for which certificates of occupancy were issued in 2003, could then use their respective units for their intended purposes. See id. The association has not identified any evidence to contradict that prima facie evidence.
By the end of 2003, certificates of occupancy had been issued for the common areas of Building A and for all but two of the condominium units in Building A. A certificate of occupancy for one of the remaining units was not issued until 2006, and there is no certificate of occupancy for the last unit in the district court record.
*630 The concept of "substantial completion" necessarily is different from the concept of perfect completion; substantial completion requires only that the construction be "sufficiently completed." Minn. Stat. § 541.051, subd. 1(a). Because the statute must be given a "common-sense interpretation," see Aquila Inc. , 718 N.W.2d at 884, we must conclude that, if the common areas of a condominium building and all but two condominium units are completed, the building as a whole is, as a matter of law, "substantially completed." Accordingly, the evidence in the summary-judgment record supports the conclusion that, by no later than the end of 2003, the construction of Building A was substantially completed for purposes of the statute of repose in section 541.051, subdivision 1(a).
The association does not challenge the district court's determination that the alleged defect in Building A was not discovered until, at the earliest, January 30, 2014. Because the construction of Building A was substantially completed by no later than the 2003, the association's common-law claims with respect to Building A accrued more than ten years after the substantial completion of the construction of Building A. Thus, the association's common-law claims concerning Building A are barred by the ten-year statute of repose in section 541.051, subdivision 1(a).
3. Discovery of Alleged Defect in Building B
The association next argues that the district court erred by determining that the alleged defect in Building B was discovered in June 2015.
"The discovery of an injury is a question of fact that is not appropriate for resolution on summary judgment when reasonable minds can differ about the timing of the discovery of the injury." 328 Barry Ave., LLC v. Nolan Props. Grp., LLC , 871 N.W.2d 745, 751 (Minn. 2015). "We apply an objective standard to determine when a property owner knew or should have known, through the exercise of due diligence, of the injury." Id.
The district court determined that the alleged defect in Building B was discovered in June 2015, when Encompass cut into the walls of Building B and found bent pipes. The association contends that there is a genuine issue of material fact concerning the date of the discovery of the alleged defect in Building B. Specifically, the association contends that the alleged defect in Building B was discovered in March 2014, when Encompass warned the association that Building B might be affected by the same type of problems it had identified in Building A. Encompass's warning does not constitute discovery of an injury, however, because the association did not know or have reason to know of a problem in Building B at that time. Id. The two buildings have separate HVAC systems. Any suspected defect in Building B would have been speculative. Thus, the district court did not err by determining that the alleged defect in Building B was discovered in April 2015.
The district court determined that the construction of Building B was substantially completed on October 14, 2004, the date on which the city issued the only certificate of occupancy for that building. The association does not challenge that determination on appeal. Because the district court did not err in its determination that the alleged defect in Building B was discovered in June 2015, the association's common-law claims with respect to Building B accrued more than ten years after the substantial completion of the construction of Building B. Thus, the association's common-law claims concerning Building B are barred by the ten-year statute of repose in section 541.051, subdivision 1(a).
*631 In sum, the district court did not err by entering summary judgment in favor of all defendants-respondents on the association's common-law claims.
B. Statutory Claims
The association also argues that the district court erred by entering summary judgment in favor of Housing Partners on its claim for breach of a statutory warranty arising under Minnesota Statutes chapter 327A.
Chapter 327A describes the statutory warranties that apply to newly constructed dwellings and also describes the periods of time in which such warranties operate:
In every sale of a completed dwelling, and in every contract for the sale of a dwelling to be completed, the vendor shall warrant to the vendee that:
(a) during the one-year period from and after the warranty date the dwelling shall be free from defects caused by faulty workmanship and defective materials due to noncompliance with building standards;
(b) during the two-year period from and after the warranty date, the dwelling shall be free from defects caused by faulty installation of plumbing, electrical, heating, and cooling systems due to noncompliance with building standards; and
(c) during the ten-year period from and after the warranty date, the dwelling shall be free from major construction defects due to noncompliance with building standards.
Minn. Stat. § 327A.02, subd. 1 (2018). In this case, count 4 of the association's second amended complaint is based on paragraph (c) of this statute, which establishes a ten-year warranty period.
Two repose provisions in section 541.051 are relevant to a claim of breach of statutory warranties. See Gomez v. David A. Williams Realty & Constr., Inc. , 740 N.W.2d 775, 781 (Minn. App. 2007) (citing Sletto v. Wesley Constr., Inc. , 733 N.W.2d 838, 843 (Minn. App. 2007) ). The first provision is subdivision 1(a), which is quoted above. See supra part I.A. The second provision is subdivision 4, which provides in part:
For the purposes of actions based on breach of the statutory warranties set forth in section 327A.02, or to actions based on breach of an express written warranty, such actions shall be brought within two years of the discovery of the breach. In the case of an action under section 327A.05, which accrues during the ninth or tenth year after the warranty date, as defined in section 327A.01, subdivision 8, an action may be brought within two years of the discovery of the breach, but in no event may an action under section 327A.05 be brought more than 12 years after the effective warranty date ....
Minn. Stat. § 541.051, subd. 4 (2018) (emphasis added). For purposes of subdivision 4, the statute-of-repose period is measured from the effective warranty date, not from the date of substantial completion of construction. Id.
The term "warranty date" is defined in chapter 327A to mean "the earliest of ... (a) the date of the initial vendee's first occupancy of the dwelling; or (b) the date on which the initial vendee takes legal or equitable title in the dwelling." Minn. Stat. § 327A.01, subd. 8 (2018). The term "initial vendee" also is defined in chapter 327A; it means "a person who first contracts to purchase a dwelling from a vendor for the purpose of habitation and not for resale in the ordinary course of trade." Id. , subd. 4. In addition, the term "dwelling" is defined in chapter 327A to mean "a new building, not previously occupied, constructed for the purpose of habitation." Id. , subd. 3.
*632 The term "building" is not defined in chapter 327A. See Minn. Stat. § 327A.01. The common meaning of the word "building" is, "[s]omething that is built, as for human habitation; a structure," The American Heritage Dictionary of the English Language 250 (3d ed. 1996), or "[t]hat which is built; a structure, edifice," The Oxford Universal Dictionary 232 (3d ed. 1964).
In this case, the district court reasoned that, because the term "dwelling" is defined to mean a "building," the statutory warranty arising from section 327A.02, subdivision 1(c), applies to each building as a whole, not to individual condominium units. Given that premise, the district court identified the "warranty date" for Building A as October 11, 2002, and the warranty date for Building B as October 19, 2004. Each of those two dates is more than ten years before the discovery of the alleged defect in the building to which the date applies. Accordingly, the district court concluded that the association's statutory-warranty claim is barred by the statutes of repose in section 541.051.
The association contends that the district court erred by determining that each building is a "dwelling" and by determining the relevant warranty dates on a building-wide basis. The association contends that the term "dwelling" should be interpreted to mean each condominium unit. But the association does not attempt to reconcile its interpretation with the statutory definition, which is a "new building, not previously occupied, constructed for the purpose of habitation," Minn. Stat. § 327A.01, subd. 3, or with the common meaning of the word "building," which refers to an entire structure, not to specific spaces within a structure, see American Heritage Dictionary , supra , at 250; Oxford Universal Dictionary , supra , at 232.
The timeliness of the association's statutory-warranty claim cannot be determined without determining the applicable warranty date or dates. See Minn. Stat. § 327A.02, subd. 1(c). The parties agree on that general concept, but the association contends that timeliness depends on the warranty date of each condominium unit, while Housing Partners contends that timeliness depends on the warranty dates of each building. As stated above, the term "warranty date" is defined in chapter 327A to mean "the earliest of ... (a) the date of the initial vendee's first occupancy of the dwelling; or (b) the date on which the initial vendee takes legal or equitable title in the dwelling." Minn. Stat. § 327A.01, subd. 8. And the term "initial vendee" is defined within chapter 327A to mean "a person who first contracts to purchase a dwelling from a vendor for the purpose of habitation and not for resale in the ordinary course of trade." Id. , subd. 4. In the context of a multi-unit condominium building, these definitions are not perfectly compatible with the definition of "dwelling" because they appear to assume that one person has purchased an entire building.
To resolve the parties' arguments, we must engage in statutory interpretation. "The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous." State v. Thonesavanh , 904 N.W.2d 432, 435 (Minn. 2017). " 'A statute is ambiguous only if it is subject to more than one reasonable interpretation.' " Id. (quoting 500, LLC v. City of Minneapolis , 837 N.W.2d 287, 290 (Minn. 2013) ). If a statute is unambiguous, "then we must apply the statute's plain meaning." State v. Nelson , 842 N.W.2d 433, 436 (Minn. 2014) (quotation omitted). But if a statute is ambiguous, "then we may apply the canons of construction to resolve the ambiguity." Thonesavanh , 904 N.W.2d at 435. This court applies a de novo standard of review *633 to a district court's interpretation of a statute. Id.
We begin by asking whether the statutory provisions at issue are ambiguous or unambiguous with respect to the issues raised in this appeal. See id. We do so by considering the plain meaning of the statutes based on "the common and ordinary meanings" of the words used in the statutes. Id. at 436 ; see also State v. Eason , 906 N.W.2d 840, 842 (Minn. 2018) ; Nelson , 842 N.W.2d at 436. One reasonable interpretation of the statutes at issue is the district court's interpretation, which deemed the purchase of the first condominium unit in each building to effectively determine the warranty date for all condominium units in that building. That interpretation observes the statutory definition of the word "dwelling" but is in tension with the statutory definitions of "warranty date" and "initial vendee" because, in the circumstances of this case, no one person purchased an entire building. A second reasonable interpretation is that warranty dates must be determined on a unit-by-unit basis. That interpretation recognizes that the warranty period is based on an initial vendee's purchase but is in tension with the statutory definition of dwelling because it would apply only if "dwelling" were interpreted to include a portion of a dwelling, such as a condominium unit. A third reasonable interpretation, which was suggested but rejected by the district court, is that no statutory warranty ever becomes effective because no initial vendee purchased an entire building. But that interpretation is in tension with chapter 327A, which provides that, for a ten-year period, a dwelling "shall be free from major construction defects due to noncompliance with building standards." Minn. Stat. § 327A.02, subd. 1(c).
Because there are multiple reasonable interpretations, the relevant statutes are ambiguous with respect to the issue in this appeal. To resolve the ambiguity, we turn to canons of statutory construction. See Nelson , 842 N.W.2d at 436. In this case, the meaning of the statutes may be ascertained by considering "the occasion and necessity for the law[s]," "the mischief to be remedied," "the object to be attained," "the consequences of a particular interpretation," and "the contemporaneous legislative history." See Sleiter v. American Family Mut. Ins. Co. , 868 N.W.2d 21, 27 (Minn. 2015). The general purpose of chapter 327A is to provide purchasers of new homes with additional warranties, see Minn. Stat. §§ 327A.02, .05, .06 (2018), and the warranties are intended to apply to "every sale of a completed dwelling," Minn. Stat. § 327A.02, subd. 1. That purpose would be undermined in this case if we were to interpret section 327A.01, subdivision 8, in such a way that no warranty ever became effective because no initial vendee purchased an entire building. The legislature intended to ensure that, for ten years after "the warranty date, the dwelling shall be free from major construction defects due to noncompliance with building standards." Id. , subd. 1(c). That provision would be frustrated to an extent if we were to adopt the district court's interpretation, which would result in a warranty period of less than ten years for all condominium units that are sold after the first condominium unit is sold. But we also observe, as we have observed before, that the legislature amended section 541.051 with the language in subdivision 4 to ensure that statutory-warranty claims are subject to a statute of repose. See Gomez , 740 N.W.2d at 781.
In light of the factors relevant to interpreting an ambiguous statute, we conclude that the second interpretation described above is the most persuasive interpretation because it best accommodates *634 the purposes of each statutory provision. See Nelson , 842 N.W.2d at 436. Thus, we interpret section 327A.01, subdivisions 3, 4, and 8, and section 541.051, subdivisions 1 and 4, to provide that, in a multi-unit condominium building, the "effective warranty date," which starts the running of the statute of repose, is determined on a unit-by-unit basis. For each condominium unit, the "warranty date" is the earlier of the date of the initial vendee's first occupancy of his or her unit or the date on which the initial vendee takes legal or equitable title to his or her unit. See Minn. Stat. § 327A.02, subd. 8.
A unit-by-unit analysis may lead to different conclusions with respect to different condominium units. In its principal brief, the association contends that there are genuine issues of material fact concerning nine condominium units in Building A due to disputes concerning whether the first vendees purchased their respective units for the proper purposes and whether warranty deeds are in the summary-judgment record. Similarly, the association contends that there are genuine issues of material fact concerning seven condominium units in Building B, for which the association states that warranty deeds were granted less than ten years before discovery of the alleged defect. Only one respondent has addressed these contentions; M & E does so by essentially conceding that, if a unit-by-unit analysis is appropriate, the association's statutory-warranty claims are not barred with respect to seven units in Building B.
We need not attempt to resolve these particular fact-intensive issues. The district court is in a better position from which to conduct a unit-by-unit analysis in the first instance. Accordingly, we remand to the district court for a determination of the extent to which the association's statutory-warranty claim is barred by the statutes of repose in section 541.051. We leave to the district court's discretion whether it is necessary or beneficial, in light of this court's interpretation of the relevant statutes, to reopen the record for additional evidence and arguments that may not have been offered in prior proceedings.
In sum, the district court erred in part by ordering summary judgment in favor of Housing Partners on the association's statutory-warranty claim.
II.
The association also argues that the district court erred by denying its motion for approval of its settlement agreement with Housing Partners. In its responsive brief, Housing Partners joins the association in arguing for reversal on this issue. All other respondents argue that the district court appropriately denied the association's motion for approval of the settlement agreement.
The association argued to the district court that the settlement agreement in this case is modeled after the settlement agreement in this court's opinions in the so-called Two Harbors trilogy. See Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc. , 549 N.W.2d 96 (Minn. App. 1996) ( Two Harbors I ), review denied (Minn. Aug. 20, 1996); Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc. , No. C6-97-1596, 1998 WL 148082 (Minn. App. 1998) ( Two Harbors II ), review denied (Minn. May 28, 1998); Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc. , 616 N.W.2d 288 (Minn. App. 2000) ( Two Harbors III ), review denied (Minn. Oct. 26, 2000). The association asked the district court to approve the settlement agreement on the ground that it is "consistent with the Two Harbors trilogy." Kraus-Anderson argued to the district court in its motion to declare the settlement agreement invalid that the *635 settlement agreement does not comply with the Two Harbors opinions and is inconsistent with caselaw concerning settlements in multi-party lawsuits.
The Two Harbors opinions arose from a contract by which the City of Two Harbors hired Rice Lake Contracting Corporation (RLCC) to improve its sewage-treatment plant. Two Harbors I , 549 N.W.2d at 98. After the project incurred cost overruns of more than $2,000,000, the city refused to pay the amount invoiced. Id. RLCC sued the city for breach of contract. Id. The city asserted third-party claims for indemnification against two consultants. Id. The city and RLCC entered into a settlement agreement that allowed RLCC to fund and control the city's prosecution of its indemnification claims against the two consultants. Id. The settlement agreement also required the city to pay RLCC $200,000 in cash and to give RLCC a promissory note in the amount of $1,585,402, which was payable only from any proceeds of the third-party claims against the consultants. Two Harbors III , 616 N.W.2d at 291.
In Two Harbors I , this court held that the district court had jurisdiction in a declaratory-judgment action to consider the motion for approval of the settlement agreement, reasoning that the impact of the settlement agreement presented a justiciable controversy. 549 N.W.2d at 101-02. In Two Harbors II , this court affirmed the district court's grant of partial summary judgment to the city and RLCC and denial of partial summary judgment to the consultants on the enforceability of the settlement agreement. 1998 WL 148082, at *7. In Two Harbors III , after RLCC had pursued the city's indemnification claims to a trial in which a jury found one of the consultants to be responsible for most of the liability incurred by the city, this court affirmed, concluding that the settlement agreement was enforceable to the extent of its specified amount. 616 N.W.2d at 291, 294.
In this case, the district court concluded that the proposed settlement agreement between the association and Housing Partners was invalid and unenforceable against the non-settling parties because it was unreasonable and collusive and because it was not disclosed to the district court or the non-settling parties. In challenging the district court's ruling on its motion, the association makes a two-part argument. This court applies an abuse-of-discretion standard of review to a district court's decision on a motion for approval of a settlement agreement. See Johnson v. St. Paul Ins. Cos. , 305 N.W.2d 571, 573-74 (Minn. 1981) ; Wilson v. St. Joseph's Hosp. , 366 N.W.2d 403, 407 (Minn. App. 1985).
A. Identification of Applicable Law
The association first contends that the district court erred by applying principles from cases that are inapplicable in this type of case. The association refers specifically to Miller v. Shugart , 316 N.W.2d 729 (Minn. 1982) ; Johnson v. Moberg , 334 N.W.2d 411 (Minn. 1983) ; and Pacific Indemnity Co. v. Thompson-Yaeger, Inc. , 260 N.W.2d 548 (Minn. 1977) (citing Booth v. Mary Carter Paint Co. , 202 So.2d 8 (Fla. Dist. Ct. App. 1967) ). The association contends that the district court failed to confine its analysis to the principles discussed in the Two Harbors trilogy.
The district court stated in its memorandum that this court's Two Harbors trilogy recognizes "that the Miller-Shugart , Moberg , and Mary Carter lines of cases all provide possible bases on which to attack the validity of a Two Harbors -type settlement." Indeed, in Two Harbors I , we cited the Miller-Shugart and Moberg opinions and stated that those opinions may serve as "adequate options to contest respondents' settlement." 549 N.W.2d at 100. In *636 Two Harbors II , we cited the Miller-Shugart and Pacific Indemnity opinions and applied some of the principles stated in those opinions. 1998 WL 148082, at *3-5.
The association asserts that Miller-Shugart should be confined to cases involving indemnification obligations arising from insurance policies. To be sure, the supreme court in Miller-Shugart considered whether two insureds breached their contractual duty to cooperate with an insurer when they settled a claim brought by a person who was injured in an automobile accident. 316 N.W.2d at 733-34. That part of the Miller-Shugart opinion would not apply if there is no contractual duty of cooperation. The supreme court in Miller-Shugart also considered whether the settlement was obtained by fraud or collusion, stating that "a money judgment confessed to by an insured is not binding on the insurer if obtained through fraud or collusion." Id. at 734. The supreme court in Miller-Shugart also considered a third issue that is not limited to the insurance context: whether the settlement agreement was "reasonable and prudent." Id. at 734-35. In that part of the opinion, the supreme court cited caselaw from outside the insurance context, which it described as "somewhat analogous." Id. at 735 (citing Samuelson v. Chicago, Rock Island & Pac. R.R. Co. , 287 Minn. 264, 178 N.W.2d 620 (1970) ). The district court's rejection of the settlement agreement between the association and Housing Partners was based primarily on the concepts in the third part of the Miller-Shugart opinion. In Two Harbors II , we considered and rejected a similar argument that the district court had "extend[ed] Miller-Shugart beyond the insurance context and into non-insurance cases." 1998 WL 148082, at *3. We reject the association's argument in this case for essentially the same reasons.
The association also asserts that the so-called Mary Carter caselaw does not apply. In Minnesota, the Mary Carter principle was adopted in Pacific Indemnity . 260 N.W.2d at 556. The indemnification obligation in that case did not arise from an insurance policy; rather, it arose-as in this case-from common-law duties among alleged tortfeasors in a case concerning damage to real property. Id. at 551-53, 555-58. In fact, one of the issues in Pacific Indemnity was the application of section 541.051. Id. at 553-55. In light of these similarities, the district court did not err by applying the principles expressed in the Pacific Indemnity opinion.
Thus, the district court did not err by relying on inapplicable legal principles.
B. Reasonableness and Collusion
The association contends in the alternative that, even if the district court identified and applied the appropriate legal principles, the district court erred by determining that the settlement agreement is unreasonable and collusive.
Although a stipulated judgment naturally is binding "as between the stipulating parties," it is binding on an indemnifying third party only if it is reasonable and prudent. See Miller , 316 N.W.2d at 735. "The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." Id. "This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." Id. In addition, a Miller-Shugart settlement agreement may be rejected if it is the product of fraud or collusion. Id. at 734. A Miller-Shugart settlement agreement is collusive if there was "a lack of opposition between a plaintiff and an insured that otherwise would assure *637 that the settlement is the result of hard bargaining." Independent Sch. Dist. No. 197 v. Accident & Cas. Ins. Co. , 525 N.W.2d 600, 607 (Minn. App. 1995), review denied (Minn. Apr. 27, 1995).
The district court rejected the settlement agreement between the association and Housing Partners for three reasons. First, the district court reasoned that the settlement agreement was not reasonable and prudent because Housing Partners could have joined in the other defendants' summary-judgment motions but elected instead to "abandon its defenses to liability" and enter into a settlement agreement in an amount that was excessive. Second, the district court reasoned that the settlement agreement was the product of collusion because "neither Housing Partners nor [the association] advised any of the other parties or the Court of their Two Harbors agreement until after they had finalized their agreement" and after the association had asked the district court to correct its first summary-judgment order to revive the association's claims against Housing Partners. Third, the district court reasoned that the settlement agreement violated the Mary Carter caselaw because it was negotiated in secrecy. The association challenges the district court's first and second reasons.
There is an ample basis in the record to support the district court's reasons for denying the association's motion. It is undisputed that Housing Partners never filed a motion for summary judgment. Housing Partners did not do so even after the district court granted the other defendants' summary-judgment motions. Housing Partners' chief manager signed the settlement agreement 14 days after the district court had filed its amended order granting other defendants' summary-judgment motions. Housing Partners' attorney testified in a deposition that Housing Partners could have served and filed a summary-judgment motion for only $5,000, which would have been paid by its insurer. Housing Partners' attorney also testified that Housing Partners did not retain an expert to assist with a defense and that Housing Partners did not attempt to negotiate a lower cap on its co-defendants' liability after the association proposed an amount that was approximately 80 percent of its out-of-pocket expenditures. The district court's reasoning concerning collusion essentially is the same as its reasoning concerning secrecy, which is consistent with Pacific Indemnity . See 260 N.W.2d at 556. Although settlement agreements generally are favored when they resolve or simplify disputes, this settlement agreement created more litigation because it revived claims that were, in substantial part, without merit.[4] Thus, the district court did not err by reasoning that the settlement agreement was unreasonable and collusive.
In sum, the district court did not err by denying the association's motion for approval of its settlement agreement with Housing Partners.
*638 DECISION
The district court did not err by granting summary judgment to all respondents on the association's common-law claims. The district court erred in part by granting summary judgment to Housing Partners on the association's statutory-warranty claim. On remand, the district court shall determine which condominium units, if any, are the basis of a statutory-warranty claim that is not barred by the statute of repose. The district court did not err by denying the association's motion for approval of its settlement agreement with Housing Partners.
Affirmed in part, reversed in part, and remanded.

Later, in May 2017, ESG was dismissed from the case by stipulation of all parties.

Rule 56 recently was "revamped" to more "closely follow" the federal rules but in a way that was not intended to alter existing Minnesota caselaw. See Minn. R. Civ. P. 56, 2018 advisory comm. cmt.; Order Promulgating Amendments to Rules of Civil Procedure , No. ADM04-8001 (Minn. Mar. 13, 2018). We cite the prior version of rule 56 because that is the version that the district court applied.

Section 541.051, subdivision 1(a), was amended, effective May 8, 2018, in ways that are not directly relevant to this appeal. See 2018 Minn. Laws ch. 116, § 1. In their respective briefs, the parties refer to the prior version of the statute. Likewise, we quote the prior version of the statute, which was in effect during district court proceedings in this case.

We acknowledge that, in light of our conclusion that the association's statutory-warranty claim survives summary judgment, see supra part I.B., Housing Partners' defenses were not as strong as the district court perceived in September 2017. But it is appropriate to review the district court's decision based on the circumstances that existed at the time of its ruling. In addition, we have affirmed the district court's ruling with respect to the association's statutory-warranty claim in substantial part and reversed and remanded for further proceedings on a small number of condominium units. For settlement purposes, Housing Partners' analysis of its statute-of-repose defense to the association's statutory-warranty claim should have considered whether Housing Partners would have been successful in substantial part.